**STATE OF NEW MEXICO,**
**Plaintiff-Appellee,**

v.

**R. Lee AAMODT, et al.,**
**Defendants-Appellees,**

**United States of America, et al.,**
**Intervenors and Appellants.**

**Nos. 75–1069, 75–1106.**

United States Court of Appeals,
Tenth Circuit.

Argued Nov. 12, 1975.

Decided June 28, 1976.

Rehearing Denied Aug. 11, 1976.

Walter Kiechel, Jr., Deputy Asst. Atty. Gen., Washington, D. C. (Wallace H. Johnson, Asst. Atty. Gen., Washington, D. C., Victor R. Ortega, U. S. Atty., Albuquerque, N. M., and Kathryn A. Oberly and Charles N. Estes, Attys., Dept. of Justice, Washington, D. C., on the brief), for appellant U. S.

Philip R. Ashby and William C. Schaab, Albuquerque, N. M. (John D. Donnell, Zinn & Donnell, Santa Fe, N. M., Ashby, Rose & Sholer and Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, N. M., on the brief), for Pueblo appellants.

Paul L. Bloom, Sp. Asst. Atty. Gen., Santa Fe, N. M., for appellee State of N. M.

Neil C. Stillinger of Watson, Stillinger & Lunt, Santa Fe, N. M. (Sumner Buell of Montgomery, Federici, Andrews, Hannahs & Buell, Thomas B. Catron of Catron, Catron & Sawtell, G. Stanley Crout of Bigbee, Byrd, Carpenter & Crout, L. C. White of White, Koch, Kelly & McCarthy, Santa Fe, N. M., on the brief), for private landowner appellees.

James C. Thompson, Espanola, N. M., filed a brief for amicus curiae Bd. of Directors El Llano Conservancy Dist.

L. Lamar Parrish of Ussery, Burciago & Parrish, Albuquerque, N. M., filed a brief for amici curiae Pueblo of Isleta and the Pueblo of Sandia.

Before BREITENSTEIN, HILL and BARRETT, Circuit Judges.

BREITENSTEIN, Circuit Judge.

The basic issue before us is whether water uses by Pueblo Indians in New Mexico are controlled by state water law based on the doctrine of prior appropriation. The United States District Court for the District of New Mexico made an interlocutory order that the Indian uses were controlled by state law. On the petitions of the United States and the Indians we allowed an appeal in No. 75–1106 pursuant to 28 U.S.C. § 1292(b) and now reverse.

In 1966 New Mexico brought suit in accordance with its water adjudication statutes, Chap. 75, Art. 4, N.Mex.Stats.Ann.,

1953, for determination of rights to the use of water of the Nambe-Pojoaque River System. That system, lying entirely in New Mexico, is tributary to the Rio Grande. Substantially all of the drainage area is within the boundaries of the San Ildefonso, Pojoaque, Nambe, and Tesuque Pueblos. The United States, the four Pueblos, and about 1,000 others were named defendants. The United States, on its own behalf and on behalf of the Pueblos, intervened to remove any immunity problem and was aligned as plaintiff. No jurisdictional question is presented. The district court referred the case to a Special Master.

The United States intervened in its proprietary capacity as owner of the Santa Fe National Forest and in its fiduciary capacity as trustee or guardian for the Pueblos. The Commissioner of Indian Affairs determined that provision of private counsel for the Pueblos was the only practical means of protecting fully the rights of the Pueblos in the face of significant conflicts of interest between the Pueblos and the United States, the far-reaching importance of the suit, and the urgency of the situation. A contract for private legal counsel was approved by the delegate of the Secretary of the Interior and funds were provided by the Bureau of Indian Affairs.

On behalf of the Pueblos the private attorneys filed a complaint in intervention. The court, on its own motion, held that the private attorneys "may not separately and independently represent the Pueblos which are already represented by government counsel", and struck the tendered complaint in intervention. No. 75–1069 is an appeal by the Pueblos from this order. The issues raised will be discussed later.

Historical background is important to an understanding of the controversy. When, in 1541–1543, the first Spanish Conquistadors invaded what is now known as New Mexico, they found numerous established Indian agricultural communities. Among those were the Pueblos with which we are concerned. The Kingdom of Spain ruled the area until 1821 when Mexico won independence. The Republic of Mexico held

dominion until 1848 when, by the Treaty of Guadalupe Hidalgo, 9 Stat. 922, it ceded the the area to the United States. Articles VIII and IX of that treaty protect rights recognized by prior sovereigns. In 1851, Congress extended the provisions of the Indian Trade and Intercourse Act of 1834, 4 Stat. 729, to the Indians of the territory newly acquired from Mexico. See 9 Stat. 574, 587. The Act of 1834 prohibited settlement on lands belonging to Indian Tribes and provided that Indians could sell their lands only to the United States. The Pueblos' land titles had long been recognized by the Spanish and Mexican governments. In 1858, these titles were confirmed by Congress. 11 Stat. 374.

Efforts of federal officials to protect the Pueblos' property were frustrated by the New Mexico territorial courts, which held that the Pueblos were outside the protection of federal laws. See *United States v. Lucero*, 1 N.Mex. 422, 442. The rationale of the New Mexico court was upheld by the United States Supreme Court in *United States v. Joseph*, 94 U.S. 614, 24 L.Ed. 295.

The 1910 New Mexico Enabling Act, 36 Stat. 557, 558–559, specified that the term "Indian country" includes "all lands now owned or occupied by the Pueblo Indians" and that such lands are "under the absolute jurisdiction and control of the Congress of the United States." The constitutionality of this provision was upheld in *United States v. Sandoval*, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107, which specifically overruled *United States v. Joseph*. Congress then had to consider the situation created by the activities of non-Indians in acquiring and occupying land within the Pueblos after acquisition of federal sovereignty. The Pueblo Lands Act of 1924, 43 Stat. 636, created the "Pueblo Lands Board" and authorized it to investigate and determine the claims of both the Indians and non-Indians to Pueblo land. In 1933 Congress authorized payment of claims presented under the 1924 Act. 48 Stat. 108. The 1924 and 1933 Acts will be discussed in detail later.

In the arid southwestern states water scarcity presents a critical problem. *Colo-*

*rado River Water Conservancy District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483, 44 L.W. 4372, 4373 (1976). The New Mexico constitution, adopted in 1911, establishes the doctrine of prior appropriation to control the use of water. N.Mex.Const. Art. XVI, § 2. One acquires a right to water by diversion and application to a beneficial use. Priority of appropriation gives the better right. Ibid. Determination of water rights is made in suit brought by the State. N.Mex.Stats.Ann., 1953, §§ 75–4–4 through 75–4–8. The instant suit to determine rights to the use of the waters of the Nambe-Pojoaque System was brought by the State in federal district court.

New Mexico and the private parties joined as defendants assert that the rights of the Pueblos are governed by the state law of prior appropriation. The United States and the Indians say that (1) the Indians have a reserved right prior to that of all non-Indians and (2) the Indians have an aboriginal right derived from the laws of Spain and Mexico and recognized by the United States in the Treaty of Guadalupe Hidalgo. This controversy is presented in case No. 75–1106.

### I.

■ We first consider procedural problems. No. 75–1069 is an appeal from the district court's denial of the right of the Pueblos to representation by private attorneys and its rejection of the complaint in intervention filed by them on behalf of the Pueblos. The State and the private defendants-appellees moved to dismiss the appeal because the notice of appeal was not signed by counsel for the United States but by private counsel who have no standing to represent the Pueblos.

Reliance is had on *Waters v. Western Company of North America,* 10 Cir., 436 F.2d 1072, which dismissed, as improvidently granted, an appeal from an interlocutory order. The court noted that the attorney filing the petition for review was not the sole counsel of record of the petitioner. Ibid. at 1073. The court recognized the ethical problem involved. Ibid. In *Waters,* the various counsel were not in agreement. In the instant case counsel for the United States have filed a memorandum opposing the motion to dismiss. Thus harmony rather than contrariety exists among counsel for the Pueblos and counsel for the United States. The orders under attack did not operate against the United States. It had no reason to appeal or to join in an appeal.

■ The State also asserts that the district court's orders denying representation by private counsel and dismissing the Pueblos' complaint in intervention are not final decisions appealable under 28 U.S.C. § 1291. *Fullmer v. Harper,* 10 Cir., 517 F.2d 20, 21, holds that the denial of a motion to disqualify counsel is a final decision within the meaning of § 1291. In that case a remand was ordered for the determination of facts because a serious ethical question was presented. No such complications are present in the instant case. Appealability under § 1291 does not depend on the grant or denial of a motion to disqualify. The grant of the motion is just as final as the denial thereof. The order is appealable under § 1291.

■ The denial of intervention is appealable if the applicant can intervene as a matter of right under Rule 24(a), F.R. Civ.P., or if the trial court abused its discretion in denying a permissive intervention under Rule 24(b). *Degge v. City of Boulder, Colorado,* 10 Cir., 336 F.2d 220, 221. The Pueblos claim an interest in the water which is the subject of the action and disposition may affect their ability to protect that interest. The claim that the Pueblos are adequately represented by government counsel is not impressive. Government counsel are competent and able but they concede that a conflict of interest exists between the proprietary interests of the United States and of the Pueblos. In such a situation, adequate representation of both interests by the same counsel is impossible. The Pueblos had a right under Rule 24(a) to intervene and the denial of that right is appealable.

The motion to dismiss the appeal in No. 75–1069 is denied, and we turn to the merits of that appeal.

## II.

■ Little more need be said about the right of the Indians to private counsel. The obligation of the United States to fulfill its fiduciary duties to the Pueblos does not diminish the rights of the Pueblos to sue on their own behalf. See *Poafpybitty v. Skelly Oil Co.,* 390 U.S. 365, 370–371, 88 S.Ct. 982, 19 L.Ed.2d 1238 and cases there cited. The instant case is not like Pueblo of *Picuris v. Abeyta,* 10 Cir., 50 F.2d 12 where the private counsel for a pueblo and counsel for the United States took contrary positions on the appeal of a case and the court held that the Attorney General of the United States, not the private counsel, controlled the course of the litigation. Ibid. at 14. The United States in the case at bar recognizes and supports the right of the Pueblos to private representation.

Section 2, Title 25, U.S.C. provides:

"The Commissioner of Indian Affairs shall, * * * have the management of all Indian affairs and of all matters arising out of Indian relations."

■ Acting under this broad authority, the Commissioner decided that "private counsel independent of any possible conflict of interest should be furnished to represent the Indian interests." His action was a fair and proper exercise of his discretion and was entirely compatible with the fiduciary obligations of the United States to the Indians. The district court erred in denying the rights of the Pueblos to independent representation by private counsel.

We have noted that the intervention on behalf of the Pueblos was an intervention of right. As such, the express terms of Rule 24(a) require that the intervention be permitted. In rejecting the intervention the district court violated the rule and its order may not stand.

## III.

In No. 75–1106 we granted an appeal under 28 U.S.C. § 1292(b) from the interloc-utory ruling of the district court that the rights of the Pueblos to the use of water of the Nambe-Pojoaque System are subject to the appropriation laws of New Mexico. A motion of the Pueblos asserts that the State of New Mexico lacks standing to participate in the appeal because it does so as parens patriae and in that capacity may not attack rights accorded to the Pueblos under § 9 of the Pueblo Lands Act of 1933, 48 Stat. 108, 111. All parties find comfort in, and rely on, the 1933 Act. The State says that the Act subjects the Pueblos' rights to the State appropriation laws and the Pueblos say that it does not. The issue is for determination when the merits of the case are considered. We will not dispose of it on a procedural motion.

■ The Pueblos also contend that as parens patriae the State represents all of its citizens and is wrongfully asserting rights in favor of the non-Indian group against the Indian group. Both the non-Indians and the Indians are citizens of New Mexico. As parens patriae a State may not assert claims on behalf of particular citizens. See *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 258–259 n. 12, 92 S.Ct. 885, 31 L.Ed.2d 184.

■ In the case at bar the State does not act as parens patriae. It brought suit in accordance with the provisions of §§ 75–4–4 through 75–4–8, N.Mex.Stat.Ann., 1953, for determination of rights to the use of water of the Nambe-Pojoaque System. Adjudication of rights is essential to the operation of the appropriation doctrine. See *El Paso & R. I. Ry. Co. v. District Court,* 36 N.M. 94, 8 P.2d 1064, 1069. The New Mexico constitution provides, Art. XVI, § 2, that the unappropriated water of every natural stream belongs to the public and is subject to appropriation in accordance with the laws of the State. Acting under statutory authority the State sued all persons, both Indians and non-Indians, claiming water rights. The presence of all claimants is necessary for a decree to be of any value. See *United States v. District Court of Eagle County,* 401 U.S. 520, 525, 91 S.Ct. 998, 28 L.Ed.2d 278. In a water adjudication suit

collision between private rights and federal rights does not affect the validity of the proceedings or the right of the State to maintain the suit. Ibid. at 526, 91 S.Ct. 998; see also *Colorado River Water Conservancy District v. United States,* —— U.S. ——, 96 S.Ct. 1236, 47 L.Ed.2d 483, 44 L.W. 4372, 4375 (1976). The Pueblos' motion attacking the standing of the State of New Mexico is denied.

## IV.

On the merits, the Pueblos contend that their rights are not limited by the appropriation doctrine. Their first claim is that they have a reserved right to so much water as is needed for the irrigation of the irrigable land within each pueblo.

In *United States v. Rio Grande Dam and Irrigation Company,* 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136, the Court held that the Territory of New Mexico could reject the common law riparian doctrine and adopt the appropriation doctrine. In so doing, the Court said, Ibid. at 703, 19 S.Ct. at 775:

"[T]hat, in the absence of specific authority from Congress a State cannot by its legislation, destroy the right of the United States, as the owner of lands bordering on a stream, to the continued flow of its waters; so far at least as may be necessary for the beneficial uses of the government property."

The reserved rights of the Indians to water was first recognized in *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340. That was a suit by the United States to restrain the construction of a dam on the Milk River in Montana which prevented the water from flowing to the Fort Belknap Indian Reservation. The reservation was created by a treaty or agreement between the United States and the Indians with the approval of Congress. The reservation lands "were arid, and, without irrigation, were practically valueless." Ibid. at 576, 28 S.Ct. at 211. The Court said, Ibid. at 577, 28 S.Ct. at 212:

"The power of the Government to reserve the waters and exempt them from appropriation under the state laws is not de-

nied, and could not be. (Citing cases) That the Government did reserve them we have decided, and for a use which would be necessarily continued through years."

*Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542, was an original jurisdiction interstate suit to determine rights to the use of waters of the Colorado River. The United States on behalf of five Indian Reservations asserted rights to mainstream water. One reservation was created by Act of Congress and the other four by Executive Orders. Ibid. at 595–596, 83 S.Ct. 1468. The Court rejected the Arizona contention that water rights could not be reserved by Executive Order. Ibid. at 598, 83 S.Ct. 1468. The Court expressly approved the *Winters* decision and held that, "the United States did reserve the water rights for the Indians effective as of the time the Indian Reservations were created." Ibid. at 600, 83 S.Ct. at 1498.

*Cappaert v. United States,* —— U.S. ——, 96 S.Ct. 2062, 48 L.Ed.2d 523, 44 L.W. 4756 (1976), recognizes the reserved water rights doctrine and says that: "The doctrine applies to Indian reservations and other federal enclaves, encompassing water rights in navigable and nonnavigable streams." Ibid. at ——, 96 S.Ct. at 2069, 44 L.W. at 4759. The Court rejected the contention that there must be "a balancing of competing interests" and after referring to the *Winters* decision said: "The Court held that when the Federal Government reserves land, by implication it reserves water rights sufficient to accomplish the purposes of the reservation." Ibid. The Court rejected the argument that the Federal Government must perfect its implied water rights according to state law and said "[f]ederal water rights are not dependent on state law or state procedures." Ibid. at ——, 96 S.Ct. at 2073, 44 L.W. at 4760–4761.

The Pueblos did not obtain any rights by either treaty with the United States or by Executive Order. The Spanish and Mexican governments recognized the Pueblos' land titles. In the Treaty of Guadalupe

Hidalgo, the United States agreed to protect rights recognized by prior sovereigns. In 1858, Congress specifically confirmed the land titles of the Pueblos with which we are concerned. 11 Stat. 374.

The 1876 Term decision in *United States v. Joseph,* 94 U.S. 614, 24 L.Ed. 295, was an action by the United States to recover a penalty under the mentioned 1834 Act for settlement on land of the Pueblo of Taos in New Mexico. The Court differentiated the Pueblo Indians from the nomadic Indians and said that the 1834 and 1851 Acts were not applicable to the Pueblos. Ibid. at 617. The Court also noted the 1858 confirmation of the Pueblo titles, Ibid. at 619, and said, "that this was a recognition of the title previously held by these people, and a disclaimer by the government of any right of present or future interference, * * *."

The *Joseph* decision was overturned by *United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107. That was a prosecution for the sale of liquor in a New Mexico pueblo. The indictment was dismissed on the ground that the pertinent federal statute was invalid as applied to the Indian pueblos in New Mexico. The Court reversed and said, Ibid. at 39, 34 S.Ct. at 3, that:

"The people of the pueblos, although sedentary rather than nomadic in their inclinations, and disposed to peace and industry, are nevertheless Indians in race, customs, and domestic government."

The Court noted that the United States has treated the pueblos "as requiring special consideration and protection, like other Indian communities." Ibid.

*United States v. Candelaria,* 271 U.S. 432, 46 S.Ct. 561, 70 L.Ed. 1023, was an action brought by the United States to quiet title to lands within a New Mexico pueblo. The district court held that suit was barred by prior litigation to which the United States was not a party. The case reached the Supreme Court on a question certified by the Court of Appeals of the Eighth Circuit. The Court referred to the 1834 Act, 4 Stat. 730, relating to the alienation of Indian lands and the 1851 Act, 9 Stat. 587, extending the 1834 Act to " 'the Indian tribes' of New Mexico." The Court said, Ibid. at 441, 46 S.Ct. at 563:

"While there is no express reference in the provision to Pueblo Indians, we think it must be taken as including them. They are plainly within its spirit, and, in our opinion, fairly within its words, 'any tribe of Indians.' "

### V.

The Pueblos contend that under the mentioned decisions they have a reserved right to water of the Nambe-Pojoaque System for the irrigation of the irrigable lands within the pueblos. The State of New Mexico and the non-Indian appropriators say that whatever reserved rights the Pueblos may have had were lost by the Pueblo Lands Acts of 1924 and 1933.

The decision in *United States v. Joseph* placing the Pueblos outside the protection of federal laws resulted in the acquisition and occupation by non-Indians of land within the Pueblos. The United States did nothing to protect the Pueblos. The *Sandoval* and *Candelaria* decisions overturning *Joseph* caused uncertainty as to the titles of both the Indians and the non-Indians. The 1924 Act, 43 Stat. 636, was enacted to quiet the title to lands within the Pueblo Indian Land Grants. It established the "Pueblo Lands Board," and directed it to investigate, determine and report the lands within the exterior boundaries of the Pueblos, the titles to which had been extinguished in accordance with the provisions of the Act.

In the 1933 Act, Congress approved compensation for the Pueblos in excess of that recommended by the Lands Board. The Committee Report says that this was done because of an error of the Lands Board. H.Rep.No.123, p. 3, infra. Private counsel for the Pueblos vigorously supported the increase in the awards. The State argues that the increase was to pay the Pueblos for whatever reserved rights they might have had to water.

The error of the Lands Board had nothing to do with reserved rights. The error

was a failure to recognize that, when the claims of non-Indians were sustained, the Pueblos lost both lands and the water rights appurtenant thereto. Litigation brought pursuant to the 1924 Act had resulted in decisions that appurtenant water went with the land. Congress increased the awards to include the value of appurtenant water.

The Committee Reports which preceded the passage of the 1933 Act support this conclusion. For practical purposes the Senate and House Reports are identical. See H.Rep.No.123, 73d Cong., 1st Sess. and S.Rep.No.73 at the same session. After referring to the mentioned court decisions, the House Report reads, pp. 3–4:

"The Indian has, accordingly, lost, under court decrees, under the doctrine of res adjudicata, certain lands with the water rights appurtenant thereto, for which loss section 6 of the act of June 7, 1924, clearly provided that he should be compensated. The present bill does no more than bring the awards up to an amount which the appraisers appointed by the Board found to be the value of this land and the water rights appurtenant thereto."

The State contends that by supporting and accepting the increased compensation the Pueblos have lost the right to claim reserved rights to the water. Section 6 of the 1933 Act provides that the Pueblos may elect to take the authorized compensation and, if they do not so elect, any independent suit by them to determine titles must be brought within one year from the approval of the Act. Neither election by them to accept nor failure to sue amounts to waiver or estoppel. They took what their guardian offered and released nothing. Title to the lands and water remaining in the Pueblos lies in their guardian or trustee, the United States. Estoppel does not run against the United States when it acts as trustee for an Indian tribe, *United States v. Ahtanum Irrigation District*, 9 Cir., 236 F.2d 321, 334, cert. denied 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367, and cases there cited. No reason is asserted to take the instant case out of the general rule.

The United States supports the claims of the Pueblos as against the non-Indians.

The question of the water rights of the Pueblos for use on the land which they retained was raised in the congressional hearings. Senators Bratton and Cutting of New Mexico asserted that the Pueblos were entitled to no preferential right. Congressman Leavitt of Montana stated, Hearings Before the House Committee on Indian Affairs on H.R. 9071, 72d Cong., 1st Sess., at 122, that:

"[W]e have got to be careful in our wording of the act of Congress that we do not extinguish an Indian right that has been long existent by a present act of Congress."

A representative of the Secretary of the Interior proposed an amendment which he characterized as recognizing for the Indians a prior right to the use of water for domestic, stockwater and irrigation purposes for lands remaining in Indian ownership. The proposal became § 9 of the 1933 Act and reads:

"Nothing herein contained shall in any manner be construed to deprive any of the Pueblo Indians of a prior right to the use of water from streams running through or bordering on their respective pueblos for domestic, stockwater, and irrigation purposes for the lands remaining in Indian ownership, and such water rights shall not be subject to loss by nonuse or abandonment thereof as long as title to said lands shall remain in the Indians."

Section 9 does not restrict the Pueblos' rights to water for use on retained land to the New Mexico appropriation laws. The provision that the Pueblos' rights are not subject to loss by nonuse or abandonment is a far cry from a submission of those rights to New Mexico law. The argument that protection against loss by abandonment is an implied recognition of New Mexico appropriation law because no protection against such loss is needed unless New Mexico law applies is unconvincing. In compliance with the Enabling Act, 36 Stat. 557, 558–559, the New Mexico Constitution,

Art. XXI, § 2, disclaims title to lands "owned or held by any Indian or Indian Tribes" and recognized with respect to such land "the absolute jurisdiction and control of the Congress of the United States." Any intent of Congress to relinquish its jurisdiction and control over the lands and water rights of the Pueblos must be express. It may not be implied from a tortuous construction of the language used in § 9.

The State's argument that § 9 was adopted as a neutral savings clause and intended to leave the question of priorities to later judicial decision is refuted by the legislative history. When the bill was before the 72d Congress, H.Rep.No.820 thereon stated, p. 6, that:

"The question of priority of water rights will necessarily be one for judicial determination, and this amendment is designed and intended to leave the matter to the courts for future action."

The 72d Congress did not pass the bill. The Committee reports to the following Congress omitted the quoted language and approved § 9 as later adopted. The omission indicates that Congress intended § 9 to have a greater effect than the submission of the controversy to the courts.

## VI.

In the *Winters* case the reserved water right doctrine was applied to a reservation created by Congress. 207 U.S. at 577, 28 S.Ct. 207. In *Arizona v. California* that doctrine was extended to Indian reservations created by Executive Orders. 373 U.S. at 596, 83 S.Ct. 1468, notes 99 and 100. Cappaert was concerned with a National Monument created by Presidential proclamation issued under the Act for the Preservation of American Antiquities, 16 U.S.C. § 431.

The Pueblos received fee simple title to their lands by the 1858 Act. 11 Stat. 374. The *Sandoval* decision, 231 U.S. at 39, 34 S.Ct. 1, and the *Candelaria* decision, 271 U.S. at 440, 46 S.Ct. 561, each hold that the Pueblos are to be treated like other Indian communities. The fact that the Pueblos hold fee simple title makes no difference. *Sandoval*, 231 U.S. at 48, 34 S.Ct. 1.

The United States has not relinquished jurisdiction and control over the Pueblos and has not placed their water rights under New Mexico law. The recognized fee title of the Pueblos is logically inconsistent with the concept of a reserved right. By the Treaty of Guadalupe Hidalgo the United States agreed to protect rights recognized by the prior sovereigns. Whatever those rights may have been, they were validated by the 1858 Act which confirmed the land claims of the four Pueblos and which said, 11 Stat. 374, that the Commissioner of the Land Office:

"shall cause a patent to issue therefore as in ordinary cases to private individuals: *Provided*, That this confirmation shall only be construed as a relinquishment of all title and claim of the United States to any of said lands, and shall not affect any adverse valid rights, should such exist."

A relinquishment of title by the United States differs from the creation of a reservation for the Indians. In its relinquishment the United States reserved nothing and expressly provided that its action did not affect then existing adverse rights. The mentioned decisions recognizing reserved water rights on reservations created by the United States are not technically applicable.

Under *Sandoval* and *Candelaria*, the United States has treated the Pueblos like other Indians. It is their guardian and trustee. The lands of the Pueblos may not be alienated without its consent. The rights of the non-Indians, whose claims to lands within the area confirmed in the Pueblos by the 1858 Act, were obtained because of the failure of the United States seasonably to protect the rights of the Pueblos.

Section 2 of the 1924 Act, 43 Stat. 636, provides that the Pueblo Lands Board after its investigations and determinations shall make a report and file a copy thereof with the United States District Court for the District of New Mexico. Section 3, Ibid.,

says that upon the filing of that report the Attorney General shall file suit in that court to quiet the Pueblos' titles to the lands for which their title has not been extinguished. In defense the non-Indians may rely on limitations of actions based on varying times of adverse possession. Section 4, Ibid. at 637. Section 5, Ibid., provides that the successful assertion of a plea of limitations shall entitle the non-Indian claimant to a decree in his favor.

### VII.

The possible non-Indian claimants may be put in these classes:

1. Those who held adversely to the Pueblos before the 1858 Act.

2. Those who held lands within the Pueblos as the result of some circumstance occurring after 1858, other than the failure of the United States seasonably to protect the rights of the Pueblos.

3. Those whose rights depend on the limitation periods recognized by the 1924 Act.

■ As to each of these groups, the water rights of the non-Indians are not connected with, or derived from, the Indians. They had independent origin. Because of that derivation, the non-Indians are not in the position of allottees or successors to allottees. The decision in *United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089, has no bearing on the problem presented.

The rights of the non-Indians are subject to the water laws of New Mexico. The water rights of the Pueblos are not subject to the laws of New Mexico because the United States has never surrendered its jurisdiction and control. The problem remaining is the interrelationship of priorities for the water rights of the Pueblos and for the non-Indians.

Much evidence was received by the Special Master on the meaning and effect of the laws of Spain and Mexico pertinent to the Indians and to the use of water. Evidence offered by the United States on the issue was rejected. The district court did not decide what was the controlling law when the area was within the dominion of either Spain or Mexico. We decline to make such decision in the first instance.

■ The crucial priority date may be 1858, the date when the United States confirmed the Pueblos' titles. It is not decisive as to any non-Indian claimant in Group 1 who prior to 1858 had an adverse right to the use of any water. If such claim is made and supported the district court must make a determination of the water rights of the Pueblos under the laws of Spain and Mexico and determine the relationship between the rights of the Pueblos and of the non-Indians in Group 1. In so doing it must consider the evidence already received and in addition that offered by the United States and rejected.

The Group 2 non-Indians are in a different position. Their acquisitions did not result from any failure of the United States to perform its obligations as guardian and trustee. Whatever claims are made and supported by non-Indians in Group 2 must be determined by the district court. Without knowing what those claims are, we can make no determination of the relationship of the Group 2 non-Indians with the Pueblos.

The Group 3 non-Indians have rights based on adverse possession. We do not know whether a water right can be acquired in New Mexico by prescription. See *Pioneer Irrigating Ditch Co. v. Blashek*, 41 N.M. 99, 64 P.2d 388, 390. Be that as it may, § 9 of the 1933 Act provides that nothing contained therein "shall in any manner be construed to deprive any of the Pueblo Indians of a prior right to the use of water."

Pursuant to the 1924 and 1933 Acts, the ownership of some lands within the Pueblos was recognized to be in non-Indians. That ownership carried with it appurtenant water. The problem is the relative priority dates of the water rights of the Pueblos and the non-Indians. Three possibilities exist. First, the Pueblos have priority over all of the non-Indians. Second, priority of all

uses, both Pueblo and non-Indians, shall be determined by the first diversion and application to beneficial use. Third, the 1924 and 1933 Acts put the priorities on parity.

The answer depends on the meaning of "prior right" as used in § 9. That term may not apply to a reserved right because the United States gave the Pueblos a quit claim deed to lands which were recognized by the Treaty of Guadalupe Hidalgo to be in their ownership. The United States had nothing to reserve. *Sandoval* says, 231 U.S. at 39, 34 S.Ct. at 3, that the Pueblos "have been regarded and treated by the United States as requiring special consideration and protection, like other Indian communities." *Candelaria* reaffirms *Sandoval* and says, 271 U.S. at 440, 46 S.Ct. at 562, that the lands of the pueblos "like the tribal lands of other Indians owned in fee under patents from the United States are 'subject to the legislation of Congress enacted in the exercise of the Government's guardianship' over Indian tribes and their property."

When the 1924 and 1933 Acts were before Congress much discussion revolved around the reserved water doctrine approved in *Winters*. By using the phrase "prior rights" in § 9 Congress may well have intended to recognize the *Winters* decision. Such an intent is consonant with both *Sandoval* and *Candelaria*. A recognition of any priority date for the Indians later than, or equal to, a priority date for a non-Indian violates the mandate of Congress that nothing in the 1933 Act shall deprive the Pueblos to a prior right to the use of water.

## VIII.

One argument remains to be mentioned. The State makes much of the economic effect on the non-Indians who were awarded lands by the 1933 Act if the Pueblos have a right prior to them. In *Cappaert,* —— U.S. at ——, 96 S.Ct. at 2070, 44 LW at 4759, the Supreme Court rejected the argument that equity calls "for a balancing of competing interests." We reach the same conclusion. The water rights of the Pueblos are prior to all non-Indians whose

land ownership was recognized pursuant to the 1924 and 1933 Acts.

The quantification of the Pueblos' rights presents another problem and, in the first instance, it must be decided by the district court. Exploration of the pertinent law of Spain and Mexico may be required. We do not know. The attention of the district court is directed to the provisions of the decree in *Arizona v. California,* 376 U.S. 340, 344–345, 83 S.Ct. 1468, 10 L.Ed.2d 542, defining the rights of the Indians.

All procedural motions in both Nos. 75–1069 and 75–1106 are overruled. In each case the orders of the district court are reversed and each is remanded for further proceedings in the light of this opinion.

BARRETT, Circuit Judge (concurring in part and dissenting in part):

I fully concur in Parts I, II, III and IV of the majority opinion.

I agree with much of the factual chronology and legal rationale set forth in Parts V, VI, VII and VIII of the majority opinion, but must respectfully dissent from some important conclusions and the ultimate disposition.

In my view, the recent Supreme Court decision in *Cappaert v. United States,* —— U.S. ——, 96 S.Ct. 2062, 48 L.Ed.2d 523 (44 U.S.L.W. 4756, 1976) supports my contention that the Congress was fully cognizant of the broad scope and reach of the so-called *Winters Doctrine* following the overruling of *United States v. Joseph,* 94 U.S. 614, 24 L.Ed. 295 (1876) by *United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913). The Congress was well aware during deliberations and hearings held prior to enactments of the Pueblo Lands Acts of 1924 and 1933 that the *Winters Doctrine* was fully applicable to all of the lands in Pueblo ownership or possession which were granted–confirmed by the United States on December 22, 1858, pursuant to 11 Stat. 374. The legislative footprints confirm that the Congress was aware that under the *Winters Doctrine* the "upstream" good faith non-Indian owners of lands and appurtenant

water rights on the Nambe-Pojoaque River System would suffer the dire economic consequences so lucidly stated in *Cappaert, supra.* Recognition that *Winters Doctrine* water rights reserved by the United States for Indians are prior to all non-Indian upstream users generated Congressional enactments of the Pueblo Lands Acts of 1924 and 1933 in order to temper, at least in part, the disastrous effects of the doctrine on the "good faith" non-Indian settlers, both downstream and upstream, by effecting a *compromise.* The 1933 Act accomplished that by subjecting the Pueblos' otherwise *Winters Doctrine* water rights on the stream system *as of May 31, 1933 to the New Mexico appropriation laws.* In my view Section 9 of the 1933 Act is critical and pivotal in "spelling out" this compromise when considered in conjunction with the legislative history of the two acts. Otherwise, much of that section is meaningless. For example, *Winters* rights cannot be lost by nonuse or abandonment unless so decreed by the Congress. The Congress did not attempt to impede the Pueblos to uses of the waters on *other* lands in their ownership to other than *Winters Doctrine* rights after May 31, 1933, in my interpretive view.

There are approximately 900 non-Indian parties involved in this suit who own lands adjacent to the Nambe System and who depend upon the waters for their economic survival. The "priority" issue which the Congress in 1933 left to the courts for ultimate disposition is now—almost 43 years later—exactly the issue which must be ultimately determined in this litigation. I suggest that unlike any other litigation heretofore presented involving Indian v. non-Indian water uses and priorities—whether under the *Winters Doctrine* or rights derived under prior sovereigns—this case does, in fact, evidence that the Congress specifically and directly did do equity and did "balance [the] competing interests" by means of enactment of the Lands Board Acts of 1924 and 1933.

Before "tracking" the language of the 1924 and 1933 Acts and the legislative history of each, some basic rules relative thereto

may be helpful. Congress possesses a paramount power over the property of the Indians by reason of its exercise of guardianship over their interests. Thus, plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one not subject to the control of the judicial department of the government. *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903); *Stephens v. Cherokee Nation,* 174 U.S. 445, 19 S.Ct. 722, 43 L.Ed. 1041 (1899). Congress possesses full administrative power over tribal property and if injury is occasioned to the Indians' property as a result thereof, relief must be sought solely by an appeal to the Congress, not to the courts. *Cherokee Nation v. Hitchcock,* 187 U.S. 294, 23 S.Ct. 115, 47 L.Ed. 183 (1902). The propriety or justification of action by the Federal Government relative to Indian lands and properties is a political rather than a judicial question and that power is plenary. *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); *United States v. Santa Fe Pacific Railroad Co.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941), rehearing denied, 314 U.S. 716, 62 S.Ct. 476, 86 L.Ed. 570 (1942); *Sisseton and Wahpeton Bands of Sioux Indians v. United States,* 277 U.S. 424, 48 S.Ct. 536, 72 L.Ed. 939 (1928); *Buttz v. Northern Pacific Railroad,* 119 U.S. 55, 7 S.Ct. 100, 30 L.Ed. 330 (1886).

While doubtful expressions in statutes are to be resolved in favor of the Indians, still effect of legislation which proves disastrous to the Indians does not justify the courts from departing from the terms of the acts as written; the responsibility for justice or wisdom of legislation rests with Congress and the fact that its effect deals harsh consequences to the Indians cannot influence the courts, whose sole province is that of enforcing, not making the laws. *United States v. First National Bank,* 234 U.S. 245, 34 S.Ct. 846, 58 L.Ed. 1298 (1914); *Choctaw Nation v. United States,* 119 U.S. 1, 7 S.Ct. 75, 30 L.Ed. 306 (1886); *Native American Church of North America v. Na-*

*vajo Tribal Council,* 272 F.2d 131 (10th Cir. 1959).

It is within the power of Congress to provide that the laws of a state shall extend over and apply to Indian country and activities thereon, where they clearly do not interfere with federal policies concerning the lands. *Warren Trading Post Co. v. Arizona Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); *Organized Village of Kake v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962).

Finally, for "guideline" purposes in viewing the purposes and effects of the 1924 and 1933 Acts, I deem it important to observe that federal courts must promote not only the statutory language but also the congressional intent underlying a statute. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Reference to the legislative history is of utmost importance in this case. And, in this regard, we should bear in mind that "when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination'." *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543–544, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940).

### The Pueblo Lands Act of 1924

The Pueblo Lands Act of June 7, 1924, 43 Stat. 636, 68th Congress, Session I, Chap. 331, S. 2932, Public. No. 253, created a three-member Board and machinery to determine title disputes within the Pueblo grants as between the Pueblo Indians and the non-Indians who occupied and held lands under claim of conveyance from the Indians.

The purpose of the 1924 Act was to make awards to the Pueblos from the United States through the Lands Board for those lands which the Board determined the Pueblos had been divested of title to non-Indian settlers due to negligence on the part of the United States government. The theory was that the United States should pay for the losses sustained by the Pueblo

Indians which it might have and should have prevented. This could not include those lands, the title to which passed from Pueblo ownership to non-Indian ownership under prior sovereigns. Obviously, in such cases the United States was not at fault.

The Board was to investigate and file reports designed to determine whether the lands within each Pueblo could be recovered for the Indians by suits to be brought by the Attorney General in the nature of quiet title relative to Indian lands, the Indian title to which the report determined not to have been extinguished. Non-Indian occupants and claimants were expressly authorized to raise a special statute of limitations in defense. Section 16 of the Act provided that the Board was to separately report relative to the extent, source and character of any water right appurtenant to the lands held in possession by the non-Indian claimants; whether the lands or water rights could be or could have been at any time recovered for the Indians by action of the United States; *the fair market value of the land and water rights; and a proviso that the United States shall be liable and the Board shall award compensation to the Pueblo Tribes within the exterior boundaries of whose lands such tract or tracts of land are situate or to which water rights shall have been appurtenant to the extent of any loss suffered by the Indians thereby.*

The Act spoke clearly to the *loss* of Pueblo water rights in relation to their fair market value as appurtenant to the lands which were *not recoverable.* The Land Board determined and reported a per acre value not to exceed $35.00 to the Pueblo in relation to lands lost because of the negligence of the United States; and that the Pueblo water rights (those applicable to lands remaining in Indian ownership) were "superior" to the "secondary" rights appurtenant to lands in non-Indian ownership. While the Board did not make specific reference to the *Winters Doctrine,* it seems certain that the Board equated the Pueblos' "superior" water rights to the *Winters Doctrine.* To that extent, then, without using the term "priority" as such, the Board *did*

reject the traditional rule applicable in the western states that a conveyance of land results in the conveyance of the water right appurtenant thereto. *To this extent, the Board was—in effect—later "overruled" by the Congress.* However, priority rights were not resolved.

The 1924 Act also provided that all sums of money appropriated by the Congress to any Pueblo or to any Indians were to be used for the purpose of purchasing "lands and water rights to replace those . . . lost . . . or for purchase or construction of reservoirs, irrigation works", etc., for the benefit of the lands held by the Pueblos.

### The Interval Between the 1924 Act and the 1933 Act

The Pueblos complained that the $35.00 per acre awards were arbitrarily low. They pointed to certain appraisals made by the Board's own appraisers that certain of their lands were worth $100.00 per acre. Many contentions, disputes and arguments relative to the nature of the *water rights* of the Pueblos on the one hand and that of the "good faith" white settlers on the other, *in terms of priority use,* persisted and festered.

In *Pueblo de San Juan v. United States,* 47 F.2d 446 (10th Cir. 1931), cert. denied, 284 U.S. 626, 52 S.Ct. 11, 76 L.Ed. 533 (1931), this Court affirmed the decree of the United States District Court for the District of New Mexico which had confirmed an award of the Pueblo Lands Board made under the 1924 Act wherein the Board found that of the 17,584.77 acres in the San Juan Pueblo Grant, the Indian title to 3,449.72 acres and the water rights appurtenant thereto had been extinguished; that 1,020.63 acres thereof could be recovered for the Indians by a suit seasonably brought by the United States; that $60,758.94 was the value of such lands, exclusive of improvements placed thereon; and that the loss suffered by the Indians was $29,090.53. An award in that amount was made. The Pueblos claimed that the award was insufficient and on appeal they contended: (1)

that an award should have been made for all the lands and water rights as to which the Board found the Indian title to have been extinguished, and (2) that the award for the loss of lands and water rights considered was inadequate. On appeal this Court first confronted the contention that it was impossible for the Pueblos, under the laws of Spain, Mexico or the United States, to have lawfully alienated its lands and that, therefore, all of it could have been recovered by seasonable prosecution of actions by the United States. This Court stated:

> . . . Furthermore, during the time the lands were under the sovereignty of Spain, lawful conveyances could have been made by the pueblo with the approval of the sovereign; and, during the time such lands were under the sovereignty of Mexico, there is strong basis for the proposition that the pueblo had authority to convey without the approval of the sovereign.

The act declares that upon review "the report of the board shall be prima facie evidence of the facts . . . .

> .    .    .    .    .

> . . . subject, however, to be rebutted by competent evidence" . . .

47 F.2d at 447.

In relation to the Pueblo contention that the method employed by the Board in arriving at the value of the land, which it concluded could have been recovered by seasonable prosecution of a suit by the United States was erroneous, this Court held that the Pueblos had not offered any competent evidence in opposition to the Board's finding. [47 F.2d 446 at 447]. Further, this Court held that the "good faith" white settlers (who occupied some 3,449.72 acres) owned both the surface estate and the water rights, declared to be appurtenant to the lands. No reference was made relative to priorities. The matter was not then at issue.

Congressional Report No. 492, April 24, 1924, Senate Calendar No. 522, accompanying S. 2932, 68th Congress, after detailed

historical recitation leading to the *Sandoval* opinion, observed in part that "Up to the time of the *Sandoval* case . . . it had been assumed by both the Territorial and State Courts of New Mexico, that the Pueblos had the right to alienate their property . . . as a result . . . conflicts as to title and right of possession arose . . hearings disclosed that there are now approximately 3,000 claimants to lands within the exterior boundaries of the Pueblo grants. The non-Indian claimants with their families comprise about 12,000 persons".

Senate Report No. 678, Calendar No. 720, 72nd Congress, 1st Session, May 9, 1932, submitted by Senator Bratton from the Committee on Indian Affairs accompanying S. 2914 (enacted May 31, 1933), stated, in pertinent part:

" . . . the object of the pending bill . . . is to compensate the Indians . . . and the non-Indians . . for the fair market value of the lands and appurtenant water rights lost by each . . . We recommend the . . . bill . . . with larger figures of compensation to Indians and non-Indians . . . that the troublesome question of land titles and right of possession to such land and appurtenant water rights may be finally disposed of . . . the departure of the . . . Board . . from the purpose of the Act of . . . 1924, was defended . . . *by reference to an erroneous theory that the Indians had not lost the water rights appurtenant to the lands and hence were not entitled to an award therefore.* . . . *The Act of June 7, 1924, and the pending bill do not bear upon any question of priority of water rights between Indians and non-Indians . . . The question of priority of water rights will necessarily be one for judicial determination, and this amendment (Section 19) is designed and intended to leave the matter to the courts for future action.*" [Emphasis supplied].

Report No. 820, House of Representatives, 72nd Congress, 1st Session, March 16, 1932, was submitted by Mr. Chavez for the House Committee on Indian Affairs to accompany H.R. 9071. This report, too, states that priority of the respective water rights is to be left for judicial determination. The report relates that at that time Indian awards made by the Board had aggregated $620,904.58. Attached to the report was a memo to the Secretary of the Interior from C. J. Rhoads, then Commissioner of the Office of Indian Affairs, dated March 14, 1932, wherein he stated, *inter-alia:*

"In the matter of water rights also a difference of treatment has occurred. In the board's findings efforts were made to preserve to the Indians in the lands that they retain priority water rights for their needs, and this factor entered into the board's findings of value of the lands and water lost to the Indians. *The reservation of a water priority was in many cases specific, was filed with the court, and should be protected.* In this bill, however, all water which, *in the opinion of the proponents of this bill, is appurtenant to the land is taken to pass with the land, and omitting as it does all reference to water priority for the remaining Indian lands, a higher valuation for the water lost is included in the . . . present-day appraisals than was used by the board. Thus the act of . . . 1924, has been interpreted one way by the board and this bill proposes to interpret it another way and to supplement or set aside the board's findings thereby making a total of $761,954.88 additional, exclusive of the amount found due the Laguna pueblo.*" [Emphasis supplied].

Report No. 123, House of Representatives, 73rd Congress, 1st Session, Report of Mr. Chavez to accompany H.R. 4014, May 10, 1933, Committee on Indian Affairs, contained these recitals of interest:

"The Act of June 7, 1924, was passed in an effort to correct a condition which had arisen through *the loss* of possession by said Indians of 5,545 parcels of land claimed by non-Indians who had settled upon and gained equitable or moral rights thereto, involving 98,000 acres. *Congress, by said Act of 1924, following the principles announced in the Sandoval*

*case . . .* assumed the liability . . . to award compensation to the pueblo within whose boundaries such tracts of land are situated, *or to which water rights are appurtenant to the extent of any loss suffered by said Indians through failure of the United States seasonably to prosecute any right of the United States or of said Indians."* [Emphasis supplied].

Accompanying the above report is a letter from then Secretary of the Interior Harold L. Ickes, dated May 9, 1933, addressed to Senator Wheeler, Chairman of the Committee on Indian Affairs which reviewed the background leading to the Act of 1924. This letter includes these observations:

"The Act of June 7, 1924, was an attempt to compromise legal rights, vested in the Indians, with moral and possibly equitable rights which had become vested in non-Indians through lapse of time; and the act established the responsibility, resting upon the United States Government, to compensate Indians and whites under certain conditions defined in the Act."

"The Pueblos were to be paid compensation . . . amounting to the market value . . . of such lands where the Pueblo title was divested . . . *this compensation . . . to be expended to procure new lands and waters to replace those surrendered or taken, thus enabling the Pueblos to reestablish their economic independence."*

"The bill (Sec. 2) authorizes . . . an increase of compensation (to the several pueblos) . . . of $761,954.88 . . . the supplemental compensation . . . when added to the compensation heretofore appropriated, *is the value, less improvements, of the lands and their appurtenant waters as found by the appraisers of the . . . Board."*

*"Section 9 provides, with respect to the lands now in Pueblo ownership, that the Indians prior rights to water shall not be subject to loss through nonuse or abandonment."* [Emphasis supplied].

Report No. 73, United States Senate, 73rd Congress, 1st Session, May 15, 1933, by Senator Bratton, Committee on Indian Affairs, to accompany S. 691:

Accompanying this report is a letter from then Secretary of the Department of the Interior, Mr. Ickes, dated May 9, 1933, which states in part:

"Section 6 provides for *election* by the Pueblos as to whether they will accept the amended compensation totals as in final settlement, or will reject the settlement through . . . suits . . . within one year after approval of the act . . . litigation . . . affecting the ownership of these Pueblo lands, will be forever ended."

"Section 9 provides, with respect to the lands *now* in Pueblo ownership, that the Indians prior rights to water shall not be subject to loss through nonuse or abandonment."

"Section 5 contains language designed to facilitate and safeguard the purchase . . . of lands and waters for the Pueblos through the expenditure of their compensation awards . . . "

There were many other documentaries, reports, hearings and debates. The question as to whether the non-Indians had obtained water rights with priorities on an equal measuring standard to that of the Pueblos was hotly debated. Senators Bratton and Cutting of New Mexico took a strong position, concurred in by the Pueblos (who were represented by independent counsel) that the Pueblos were not entitled to any preference over the non-Indian settlers and that all were subject to the appropriation laws of New Mexico.

*One must necessarily ask at this juncture:* In view of the determination by the Lands Board, acting pursuant to the 1924 Act, that no appraisals [and, of course, no awards] were to be made relative to water rights in use on lands occupied by the "good faith" white settlers—because the Board considered them to be "secondary" to the "superior" water rights held by the Pueblos applicable to lands remaining in Pueblo ownership—what did the Pueblos *lose* justi-

fying *additional* appropriations under the 1933 Act? There is no doubt, in my view, that the 1933 Act rejected the Board's determination made under the 1924 Act that the Pueblos had not "lost" these water rights, for which they were granted *additional compensation*. Under these circumstances, how can it be said that the Pueblos "lost" any water rights—in the all-important sense of priority—notwithstanding the additional compensation paid for the *loss* if, as the majority opinion holds, *all* Pueblo water rights now in use or which may hereafter be placed in use on Pueblo lands are not subject to the appropriation laws of New Mexico but are *Winters Doctrine* rights? If this be so, no compromise was effected and the Pueblos were compensated for the loss of water rights which are "inferior" in terms of priority to *all* water rights they retained.

It is significant that it was well recognized that at least 80 percent of the lands within the exterior boundaries of the Pueblo grants had been acquired by the white settlers (thus alienated from Indian title) in *good faith*.

### The Pueblo Lands Act of 1933

The Pueblo Lands Act of May 31, 1933, 48 Stat. 108, 73rd Congress, 1st Session, Chap. 45, H.R. 4014, Public No. 28, authorized to be appropriated sums to the Indian Pueblos "for the purchase of lands and water rights to replace those which have been divested from said pueblo under the Act of June 7, 1924, or for the purchase or construction of reservoirs, irrigation works, or other pertinent improvements upon or for the benefit of the lands of said pueblos".

Sec. 2 provided:

"In *addition* to the awards made by the Pueblo Lands Board, the following sums . . . are, authorized to be appropriated:"

Sec. 9 provided:

"*Nothing herein contained shall in any manner be construed to deprive any of the Pueblo Indians of a prior right to the use of water from streams running through or bordering on their respective pueblos for domestic, stock-water, and irrigation purposes for the lands remaining in Indian ownership, and such water rights shall not be subject to loss by nonuse or abandonment thereof as long as title to said lands shall remain in the Indians.*" [Emphasis supplied].

In my judgment, unlike the view of the majority, Section 9 becomes critical and pivotal in the disposition of the "priorities" dispute involved in this litigation.

The appellants argue that: (a) the 1933 Act clearly established *Winters Doctrine* water rights for the Pueblo Tribes and repudiated the contention that the Pueblo Lands Act of 1924 adopted the doctrine of prior appropriation to limit the water rights of the Indian Pueblos; (b) Section 9 of the 1933 Act established for all of the Pueblos the protection of priority to all lands remaining in Indian ownership relative to the water needed for "domestic, stock-water, and irrigation purposes" not to be lost by "nonuse or abandonment . . . as long as title to said lands shall remain in the Indians"; and (c) had Congress intended that the Pueblos' rights be defined by the doctrine of prior appropriation, it would have stated that their rights were limited to lands previously or presently irrigated, subject to forfeiture with respect to lands not under irrigation.

Appellees counter, contending that the entire logic of the 1933 Act was directed to Congressional recognition of the correctness of the Pueblos' long-time contention that they were entitled to additional monetary compensation precisely because the Board, in its report submitted under the 1924 Act, had erroneously relied on the *Winters Doctrine* theory in determining that the Pueblos' water rights on lands remaining in Indian ownership were "superior" to the "secondary" water rights of the white settlers. They point out that Senators Bratton and Cutting believed, just as did representatives of the Pueblos, that the Pueblos had *lost* lands and appurtenant water rights (which Senator Bratton described as in many instances worth more than the land in this arid region) to white settlers who had dealt

in good faith. Appellees contend that these white occupants whose title was ultimately affirmed, were unquestionably relegated to the New Mexico law of prior appropriation—beneficial use and that the Pueblos were, by reason of the full compensation paid for their lands and water rights *lost* (which they opted for), likewise fully subject to the appropriation law of New Mexico. Furthermore, appellees contend that the various reports and letters leading to the 1933 Act demonstrate that Section 9 was intended simply to prevent the loss through forfeiture or abandonment of the ancient water rights appurtenant to the lands remaining in Pueblo ownership, and that the entire logic of the 1933 Act was a recognition of the contention pressed by the Pueblos and their attorneys before the Congress that they were entitled to additional compensation precisely because the Board had relied on the "erroneous theory" of the applicability of the *Winters Doctrine* in its report under the 1924 Act.

### Disposition

The detailed review I have made has not been undertaken for the purpose of deciding questions not raised or resolved by the District Court. *Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). My purpose, rather, has been that of detailing facts and circumstances which I deem relevant in order to focus on the difficult issues in conflict. I must reject the District Court's broad sweeping "across the board" finding that the Pueblos are subject to the doctrine of prior appropriation and beneficial use under the laws of New Mexico. I would set the judgment aside and remand for further proceedings.

I conclude that in light of the facts and circumstances leading to the May 31, 1933 Act the Congress and the Pueblos determined that in consideration of additional appropriation of public funds the Pueblos' *Winters Doctrine* rights then in *"use"* or which *had been in use* on the reserved lands for irrigation purposes as of May 31, 1933, were subject to the prior appropriation-beneficial use laws of New Mexico, thus plac-

ing those lands and water rights on the same footing as those of the non-Indian "good faith" settlers then owning lands and appurtenant water rights, both downstream and upstream from the Pueblo lands; subject, however, to the proviso that at no future time could the Pueblos' water rights be lost by non-use or abandonment. I am fully cognizant of the difficult problem involving the determination of priorities relative to the various uses, many of which "track" to the Spanish and/or Mexican rules. I do not construe Section 9 of the 1933 Act to subject those "new" uses—that is, Pueblo Indian uses made on lands after May 31, 1933, not previously irrigated—to the same restriction. Those uses, in my opinion, are not subject to the "compromise" above referred to. They enjoy the full benefit of the *Winters Doctrine.* Those uses are "superior" to all upstream non-Indian users based upon the Pueblos' right to apply water to those lands in an amount necessary " . . . to irrigate all the practicably irrigable acreage [not otherwise irrigated prior to May 31, 1933] on the reservations". *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963).

I would remand with instructions that the District Court conduct such further proceedings deemed necessary and to make findings of fact and conclusions of law detailing the relationship—in terms of specific lands, the appurtenant water rights, their uses and priority—on the entire Nambe-Pojoaque River System between the Pueblos and the non-Indian land owners (1) as of May 31, 1933, and (2) from and after May 31, 1933.