JICARILLA APACHE TRIBE, Appellant,

v.

UNITED STATES of America et al., Appellees,

State of New Mexico, ex rel. S. E. Reynolds, State Engineer, Amicus Curiae.

No. 77–1737.

United States Court of Appeals,
Tenth Circuit.

Submitted March 12, 1979.

Decided June 22, 1979.

Edward J. Shawaker, Dept. of Justice, Washington, D. C. (James W. Moorman, Asst. Atty. Gen., Washington, D. C., Victor R. Ortega, U. S. Atty., Charles N. Estes, Jr., Asst. U. S. Atty., Albuquerque, N. M., Dirk D. Snel, Dept. of Justice, Washington, D. C., on the brief), for appellees.

Richard A. Simms, Sp. Asst. Atty. Gen., Santa Fe, N. M., for the State of New Mexico, amicus curiae.

Lester K. Taylor, of Nordhaus, Moses & Dunn, Albuquerque, N. M., for appellant.

Before HOLLOWAY and BARRETT, Circuit Judges, and MILLER,* Judge, United States Court of Customs and Patent Appeals.

BARRETT, Circuit Judge.

The Jicarilla Apache Tribe, residing on a Reservation in the State of New Mexico, appeals from a *sua sponte* Order entered July 19, 1977, dismissing the Tribe's complaint filed December 12, 1975.[1]

A detailed recitation of the multi-faceted litigative history will facilitate our review.

### Litigative History
#### a. State Action

Prior to the filing of the Tribe's complaint in the case at bar, the State of New Mexico, by and through its State Engineer, filed, on March 13, 1975, a complaint in the New Mexico State District Court for the County of San Juan seeking a general water rights adjudication pursuant to New Mexico statutes of all the water rights and uses, both surface and underground, of the San Juan River Stream System, which includes the San Juan River and its tributaries. That action, entitled *State of New Mexico, ex rel. Reynolds, State Engineer v. United States of America, et al.*, San Juan County District Court, No. 75–184, was pending on December 12, 1975 when the instant suit was filed. In that action, the United States of America was named as a party defendant pursuant to the McCarran Amendment, 43 U.S.C.A. § 666(a), in its own behalf and on behalf of its wards, to-wit, three Indian tribes, including the Jicarilla Apache Tribe, hereinafter referred to as Tribe, who use and occupy federally owned Indian Reservation lands within the stream system in the State of New Mexico.

On April 14, 1975, the United States filed its petition for removal of the action to federal district court. Simultaneously, the United States moved to dismiss the Indian water rights adjudication from the state court's jurisdiction on the premise that the removal jurisdiction of the federal district court was derivative from the San Juan County District Court and that the state court lacked jurisdiction to adjudicate the rights of the United States for its Indian wards. The State of New Mexico and some defendants moved to remand.

On October 23, 1975, the federal district court entered an order remanding the cause to the state district court for San Juan County. The court found that the state court was vested with jurisdiction over the water rights of the United States, as fiduciary on behalf of the three Indian tribes.

The United States again petitioned to remove the proceeding from state court to federal district court. The court denied the petition for removal and granted the motion to remand to the district court of San Juan County based on an express finding that the state court had jurisdiction to adjudicate both the Indian and non-Indian water right claims of the United States. The United States, following this remand, filed a motion to dismiss in the District Court for San Juan County alleging that the state court lacked jurisdiction over the claims on behalf of the three Indian tribes because of alleged conflicts of interest confronting the United States in adequately representing the Indian wards. The members of the Tribe moved to appear *amicus curiae* in support of the United States' motion to dismiss. The motion was denied. The United States was directed to assert and file water right claims on behalf of the three tribes.

Thus, when the instant action was filed, the jurisdictional dispute, i.e., general adjudication of water rights between state court vs. federal court, had been presented several times.

---

* Of Washington, D. C., sitting by designation.

1. The State of New Mexico filed an Amicus Curiae Suggestion for Want of Jurisdiction.

### b. Federal Action

The Tribe's complaint, filed on December 12, 1975, in the case at bar, was two-pronged in terms of relief sought. First, it sought a general adjudication of water rights on the Navajo River System and its tributaries, for use in the State of New Mexico. Second, it sought injunctive relief against the Secretary of the Interior and the United States to restrain the Secretary from diverting water from the Chama—Rio Grande River system through the San Juan-Chama Project insofar as such diversions are in excess of the amounts of water which can be beneficially used by parties who have contracted with the Secretary of the Interior for said waters. The Tribe alleged, *inter alia*, that the diversions by the Secretary violated provisions of the Upper Colorado River Compact.

In its Answer to the Tribe's Complaint, the United States pleaded *inter alia*, (a) that the United States owns lands in the watershed of the Navajo River and its tributaries administered by the Secretary [of Interior] and various government agencies, for which the United States claims the right to impound and divert the waters of the Navajo River and its tributaries, *which claims are adverse to the claims of the Tribe . . . .* Included in said lands are lands administered by the Bureau of Land Management, lands on which public watersheds and springs are located reserved for public watering purposes, and National Forest lands; and (b) that the United States claims the right to impound, divert and use waters of the Navajo River and its tributaries [and has done so] *but denied that the diversions of the waters from the rivers for the San Juan-Chama Project [reclamation] are adverse to and jeopardize the rights of the tribe.* (Emphasis supplied.) [R., Vol. I, pp. 10, 11.]

Motions to dismiss were also filed. In partial—but significant—resistance to the Motion to Dismiss *in the case at bar*, the Tribe argued, *inter alia* :

Plaintiff [Tribe] alleges that this Court has jurisdiction under 28 U.S.C. § 1362 and 43 U.S.C. § 666(a) . . . .

28 U.S.C. § 1362 states:

The district court shall have original jurisdiction of all civil actions, brought by any Indian Tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

43 U.S.C. § 666 is the McCarran Amendment.

28 U.S.C. § 1362 enables Indian tribes to bring suits in federal court to protect property granted them by the Federal Government when the United States has declined to act in their behalf. *Standing Rock Sioux Indian Tribe v. Dorgan,* 505 F.2d 1135 (C.A. 8, 1974). *Poafpbitty v. Skelly Oil Co.,* 390 U.S. 365 [88 S.Ct. 982, 19 L.Ed.2d 1238] (1968).

The plaintiff has on numerous occasions demanded that the United States or its appropriate agency take action to protect the Tribe's water rights and that the Secretary and his agencies cease wrongful diversion of water from the Navajo and Little Navajo Rivers in violation of the rights of the Tribe . . . the United States has ignored these demands . . . the issue of Plaintiff's rights to the water claimed [as against the alleged improper diversion by the United States] cannot be raised in that (State) Court . . . The Jicarilla Apache Tribe is not a named party in the (State) case . . . The United States of America is a named party . . . The plaintiff herein cannot, because of its sovereign immunity, be joined as a party . . . The United States as the named defendant is the only party which can protect the Tribe's water rights in (the State action) . . . This places the United States in the position of making claims against itself; an obvious conflict of interest . . . The United States . . . is charged [under the McCarran Amendment] with the duty of representing the Bureau of Reclamation, the National Park Service, the Bureau of Land Management, the Bureau of Sport Fisheries

and the three Indian tribes previously named, in their adverse claims to the waters . . . The conflicts of interest inherent in the position of the United States cannot be resolved (in the State Court proceeding) . . . *In this case, claims are asserted against the Secretary separate from the issues of adjudication of water rights.* . . . (Emphasis supplied.) [R., Vol. I, pp. 34–36.]

### Hearing Below

The District Court conducted a hearing July 5, 1977, on the State's Suggestion of Want of Jurisdiction. The Court observed that the Tribe ". . . is claiming that the United States doesn't represent them . . . [and] . . . that they have sovereignty separate and apart from the United States." [R. Vol. II, p. 7.] With respect to the alleged "conflict of interest" problem, the Court requested that the parties address the question whether, without assuming jurisdiction for general adjudication of water rights on the system, the Court should independently entertain jurisdiction of that portion of the Tribe's suit involving the trans-mountain diversion, i. e., the diversions through the San Juan-Chama Project. [R., Vol. II, p. 12.]

### a. Jurisdiction Relative to General Water Rights Adjudication

In the course of the hearing the State contended, relating to the general water rights adjudication, that this could only be accomplished in one forum and that the state court action was pending prior to the instant suit. Further, the State argued that the United States is the actual claimant on behalf of the Tribes by virtue of the McCarran Amendment. [R., Vol. II, p. 18.] Counsel for the Tribe challenged the jurisdiction of the New Mexico State Engineer [and, thus, the jurisdiction of the state court] to adjudicate the Tribe's claim that the Secretary of the Interior and the Bureau of Reclamation are diverting waters from the San Juan-Chama project in contravention of the Colorado River Compact

and the rights of the Tribe. [R., Vol. II, pp. 21–24.]

In response to the Tribe's contention, the Court suggested and later urged that the case be bifurcated in such a manner that the Federal District Court would ". . . hear the questions that involve the transmountain diversion separately." [R., Vol. II, pp. 24, 45.] After the Court ordered the dismissal, counsel for the Tribe inquired, "Might I ask are you dismissing the entire complaint?" to which the Court responded, "Yes, I tried to get you to stay in about the trans-mountain water diversion, but you disagreed with that." [R., Vol. II, p. 47.]

The Court's discourse with counsel for the United States in the course of the hearing relative to the jurisdictional issue applicable to the guardianship responsibilities of the United States deserves special note:

> *MR. ESTES:* . . . the United States did not ask to be sued in this particular case, but, now that we have been, I haven't seen anything that convinced me that this Court does not have the jurisdiction. I think there is general agreement that over the matter of the San Juan-Chama diversion—whether or not those diversions are within keeping of the law, there seems to be an agreement that the Court could decide that matter.
>
> *THE COURT:* Now, here is their argument. You are guardians of the Apaches and the Navajos and the Utes and, therefore, there is a conflict of interest. You can't represent any of them and, therefore, they come in on the basis of the decision where our circuit court said that where there is a conflict of interest, the Tribes can get their own lawyers and I have let them proceed on this basis. I don't think the court went so far as to say that you weren't still the guardian of them. They did say where there was a conflict of interest they could get their own lawyers.
>
> *MR. ESTES:* You have stated that accurately. In this case, we have to deal with the situation that goes one step further. The United States has normally in the New Mexico district of San Juan

County asserted that we recognize the conflicts are extremely strong *and have disclaimed the power to recognize the Indian Tribes in this case.* [Emphasis supplied.]

The fact remains that the Tribes feel since the United States has conceded that it was not proper for us to represent them that that does give them some impetus to bring an action to establish their rights.

*THE COURT:* Well, if they go ahead—the Jicarilla and Apache Tribes—and they do establish their rights, then you may have to abdicate your guardianship over them.

*MR. ESTES:* No, Your Honor, nowhere in the lawsuit have we felt that we have to do that. That is really all I have to add.

I might say a word about the practical problem that you can't take one stream that is a tributary to another and adjudicate it separately.

*THE COURT:* If you mean by that that we don't intend to adjudicate the whole thing, the Rio Grande River, we are going to adjudicate it eventually and we have to do it by section and eventually we will have the other rights determined.

*MR. ESTES:* Proceeding rather similarly to what Your Honor is suggesting—if that could be followed here—it does seem to me that, if some arrangements were made for representation downstream, then a way could be found to adjudicate that decree.

*THE COURT:* That is why I suggested bifurcating the case, but counsel, for the Indians, they don't agree to this. I said we could bifurcate the case and hear the questions that involve the trans-mountain diversion separately, and they said "no," that it has to be done in the one as well as in the other.
[R., Vol. II, pp. 43–45.]

We believe that the above-quoted portion of the hearing transcript discloses that notwithstanding the Federal District Court's offer and suggestion that it hear and deter-

mine those "conflicts" between the Tribe and the United States involving the diversions of water from the Chama—Rio Grand River system through the San Juan-Chama Project [the matter alleged by the Tribe to arise under laws of the United States invoking the original jurisdiction of the Federal District Court pursuant to 28 U.S.C. § 1362, *supra*], such offer was rejected by Tribe simply and only to preserve the exclusive original jurisdiction over general adjudication of water rights contention.

#### b. Jurisdiction Relative to Diversion

The State also argued at the motion hearing that in view of the *Akin* decision [*Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)] and the specific language of the McCarran Amendment, the state court is the proper forum, under the circumstances, in which to adjudicate the various water right claims, including those of the United States on behalf of the Tribe. [R., Vol. II, pp. 9–10.] Both the State and the Court viewed the controversy involving the trans-mountain diversion of water through the Chama River Project by the United States (involving the alleged conflict of interest between the United States and the Tribe) as severable from the general adjudication of water rights then pending before the state court.

After the Court ruled against the Tribe's contention that the Navajo River is not legally part of the San Juan River system subject to adjudication in New Mexico, the following colloquy occurred:

*MR. SIMMS* (for State): I know the pleadings they [Tribe] said it [the Navajo River] is a separate river [from the San Juan River in New Mexico], but counsel just got up and said it has been litigated as to the rights on that river in the state suit.

*THE COURT:* What is your position on that?

*MR. TAYLOR* (for Tribe): Our position, Your Honor, is that the Navajo River—it lies in Colorado, goes through the San Juan River. It is physically a tribu-

tary of the San Juan. Our contention is that it is legally not because . . .

*THE COURT:* Well, I am going to rule against you. It is part of the stream system. I don't think there can be any question of it being part of the San Juan River stream system . . .

*MR. SIMMS:* The fact that it is a part of the stream system goes to the importance of the exclusive jurisdiction (for general adjudication of water rights) of one court. Referring to the map, the river comes down from Colorado in here, hits the San Juan River, and goes right back into Colorado here. There are all kinds of water rights here, some federally owned and some privately owned and no rights in Colorado on the Colorado portion of the Navajo River.

*THE COURT:* I will tell you what worried me a little bit was whether they are trying to stop the United States from that trans-mountain water diversion over into the Chama River.

*MR. SIMMS:* It is the other half of the Jicarilla suit.

*THE COURT:* Isn't there a suit pending that raises the question? [1]

[1] On March 17, 1975, Tribe filed a Motion to Intervene in a suit filed in the United States District Court for the District of Colorado entitled *Schutz v. Stamm*, No. 74–M–318, seeking adjudication of its rights to the use of the waters of the Navajo River and its tributaries and injunctive relief against the Secretary of the Interior as a result of diversion of water under the San Juan-Chama Project. That motion was granted but only insofar as it related to the injunctive relief sought against the Secretary of the Interior.

*MR. SIMMS:* There is a suit pending in the district court of Colorado which raises similar questions, and the Jicarillas have participated in that litigation also but, to go on here . . .

\*　　\*　　\*　　\*　　\*　　\*

*THE COURT:* Let me ask you another question. Should I in this suit determine the trans-mountain diversion question without relation to the water rights that are being adjudicated on the San Juan?

*MR. SIMMS:* I think counsel for the Jicarillas could best answer that question.

*Our only interest is that this Court lacks jurisdiction insofar as the adjudication of rights, which is being done in state court.*

*As to the other part of the Jicarilla cause, we have no interest and the state is not suggesting a want of jurisdiction insofar as that portion of their cause is concerned.* (Emphasis supplied.)

\*　　\*　　\*　　\*　　\*　　\*

. . . as to the statement that the State of New Mexico has no authority except as administrator for water diverted by non-federal entities, once adjudication is completed in the San Juan court . . . the court would appoint the state engineer to administer those waters if need be. *If the court did appoint a water master, the water master would have to administer that river in accord with the priorities of all of the federally owned rights and all of the [other] rights of the people on the San Juan and on the Navajo.* (Emphasis supplied.)

\*　　\*　　\*　　\*　　\*　　\*

*MR. SIMMS:* . . . All claimants to the rights to use of the waters of the San Juan River stream system must of necessity be before the [one] court. The United States is the actual claimant on behalf of all three Tribes.

\*　　\*　　\*　　\*　　\*　　\*

*MR. NORDHAUS* (for Tribe): Our contention is that most of the waters that are stored and impounded in Navajo Lake at the Federal Reclamation Project are not subject to the jurisdiction of the state; that before this stream comes back into New Mexico, it actually becomes part of a major federal project over which the state engineer does not have jurisdiction [over the federal user].

[R., Vol. II, pp. 12–19.]

Tribe's prayer for injunctive relief thus related to diversions of water through the San Juan-Chama [Reclamation] Project by the Secretary of the Interior in alleged violation of the provisions of the Upper Colorado River Compact, the Reclamation Development Act of 1974 and the San Juan-

Chama Project Act. [R., Vol. I, p. 14.] This portion of the Tribe's complaint, as we have previously noted, was the primary "vehicle" employed in a "bootstrapping" sense to convince the Court that it had pendent jurisdiction to entertain the Tribe's complaint by virtue of 28 U.S.C. § 1362, *supra.*

Based on § 1362, *supra,* the Tribe urged that assuming *arguendo* the San Juan District Court had jurisdiction, the federal district court should still exercise its pendent jurisdiction discretion in order to ". . . prevent multiple litigation and its attendant cost to the Jicarilla and Apache Tribes." [R., Vol. II, p. 28.]

### The Dismissal Order

The District Court's order dismissing Tribe's Complaint predicated on the State's Suggestion for Want of Jurisdiction followed extensive pleadings, briefing and oral arguments. The Court found and concluded, *inter alia,* that: an action was pending in the New Mexico State District Court for the County of San Juan at the time Tribe filed the instant action; the state action, entitled *State of New Mexico, ex rel. S. E. Reynolds, State Engineer v. United States of America, et al.,* No. 75–184, is a case brought by the State for the purpose of a general adjudication of rights to the use of the water in New Mexico from the San Juan River and its tributaries, including the Navajo River; the United States of America was joined as a defendant in the state adjudication proceeding under the authority of the so-called McCarran Amendment, 43 U.S.C. § 666, both in its own behalf and on behalf of the Navajo, Ute Mountain Ute, and Jicarilla Apache Tribes of Indians; the state district court has exclusive jurisdiction to proceed to determine all rights to the use of the water in New Mexico from the San Juan stream system, including the claims of the United States on behalf of the Tribe to the waters of the Navajo River; Section 75–4–6, N.M.S.A. (1953 Comp.) provides that "[T]he Court in which any suit involving the adjudication of water rights may be properly brought shall have exclusive jurisdiction to hear and determine all questions necessary for the adjudication of all water rights within the stream system involved . . ." which provision is binding on the United States as a defendant in the state action by virtue of 43 U.S.C. § 666, which provides in part that "[t]he United States, when a party to any such [stream adjudication] shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto"; in light of *Colorado River Water Conservation District, et al. v. United States, supra,* the effect of N.M.S.A. § 75–4–6, is made applicable to the United States by 43 U.S.C. § 666, precluding the Federal District Court from the contemporaneous exercise of its concurrent jurisdiction.

### Issues on Appeal

On appeal, Tribe contends that the District Court erred in dismissing its Complaint in that: (1) the Federal District Court for the District of New Mexico has exclusive jurisdiction to adjudicate the water rights of the Tribe inasmuch as (a) the New Mexico Enabling Act and Constitutional Disclaimer precludes state court jurisdiction, and (b) the McCarran Amendment does not repeal the Disclaimer provision, (2) the Federal District Court has exclusive jurisdiction of the Tribe's claim against the Secretary of the Interior for wrongful diversion of water through the San Juan-Chama Project, and (3) the Federal District Court has pendent jurisdiction (which it may decline to exercise) to adjudicate the claims of the Tribe to the Navajo River, as a stream system separate from the San Juan River Stream System. Further, Tribe argues that the order is final and appealable.

The United States also appeals, contending that: (1) the state court lacks jurisdiction to adjudicate the water rights of Indian tribes in New Mexico in light of the Disclaimer language contained in the New Mexico Enabling Act and the State Constitution, which have not been repealed, (2) the Federal District Court is not bound by state statutes giving state trial courts exclusive jurisdiction, and (3) this court has appellate jurisdiction.

The State of New Mexico, ex rel. S. E. Reynolds, State Engineer, has filed an amicus brief. It also presented oral argument on appeal. It is the contention of the State that: (1) the District Court for the County of San Juan, New Mexico, is vested with exclusive jurisdiction to adjudicate the rights to the use of the waters of the San Juan River stream system in that, (a) the Federal District Court lacks jurisdiction either on the basis of the exclusive jurisdiction rule or discretionary considerations of wise judicial administration, (b) the Disclaimer provisions of the New Mexico Constitution are irrelevant to the adjudicatory jurisdiction of the San Juan County District Court, and (c) there are no provisions in the New Mexico Enabling Act or the Executive documents establishing the Jicarilla Reservation which make the Reservation an exclusive federal enclave; (2) the Jicarillas cannot be heard to complain of the District Court's dismissal of their claim against the Secretary of the Interior inasmuch as that claim was dismissed at the urging of the Jicarillas; (3) the determination of the water rights of the United States on behalf of the Jicarilla Apache Tribe cannot be bootstrapped out of the San Juan adjudication in the guise of an injunction action against the Secretary of the Interior; and (4) the District Court's order dismissing the Jicarilla action should have been reviewed by writ of mandamus rather than by appeal.

### I.

■ Tribe argues, and we agree, that the practical effect of the District Court's dismissal order is the termination of the entire case in Federal District Court. There was nothing tentative, informal or incomplete about the order. In *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), the Court stated that the finality requirement should be given a "practical rather than a technical construction." Here, the order of dismissal disposed of the whole case, including the Tribe's contention that because of federal law the state court was without jurisdiction to adjudicate the water rights of the Tribe.

Furthermore, the record establishes that this issue is capable of repetition—evidence the previous jurisdictional disputes and attendant orders involving the proper forum. We believe that the order falls "four square" within the so-called collateral order doctrine of *Cohen* and *Swift and Company Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950) which identify these three characteristics of an order as meeting the "finality" requirement: (1) the order must be final in terms of determination of the claim of right separable from the rights asserted in the action (complaint), (2) the issue or issues determined by the order must be too important to be denied review in that present and serious questions of unsettled law are involved, and (3) the primary issue of jurisdiction is of such general importance beyond the immediate concern of the litigants that it requires settled determination. The "finality" requirement was given a broadened base for appellate review purposes in *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964), where the court re-affirmed the *Cohen* test of "practical rather than a technical construction" and went one step further. It determined that courts of appeal have the power to answer questions (and decide issues) fundamental to the further conduct of the case in those instances of "marginal" finality. The *Cohen* rule was again re-affirmed in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). *See also: Sherman v. American Federal of Musicians*, 588 F.2d 1313 (10th Cir. 1978); *Seiffer v. Topsy's International, Inc.*, 520 F.2d 795 (10th Cir. 1975), *cert. denied*, 423 U.S. 1051, 96 S.Ct. 779, 46 L.Ed.2d 640 (1976).

■ In accepting Tribe's contention that the practical effect of the order is termination of the entire case in federal court, we reject the State's contrary contention. State contends that because both the Tribe and the United States are in agreement on the issues on appeal (just as they were aligned in the District Court), there is, in

truth, no controversy between the *parties* and thus no real, substantial "case or controversy" between those who appear as adverse parties to the suit. The State, accordingly, refers to the alignment as one of "tactical convenience" and a "contrived appeal in which there is no adversity" and the attendant absence of a justiciable controversy on appeal. [Supplemental Memoranda of Amicus Curiae, p. 6.] Predicated thereon, State contends that the Tribe's sole review of the order of dismissal was by mandamus pursuant to Rule 21 of the Rules of Appellate Procedure. [Supplemental Memorandum of Amicus Curiae, p. 4.] This argument fails, in our view, simply because the Tribe's complaint satisfies the threshold requirement of Art. III of the Constitution that one who seeks to invoke the power of the federal courts must allege an actual case or controversy. Tribe contends, *inter alia*, that under federal law and a specific statute (28 U.S.C. § 1362), the Federal District Court has original and exclusive jurisdiction relative to the general water rights adjudication. The Supreme Court has held that when Congress enacts statutes creating legal rights, the invasion thereof creates standing even though no injury would exist without the statute. *Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). The Tribe argues that inasmuch as it is not a named party to the State District Court (San Juan County) proceeding and because the United States as a named defendant is the only party who can protect the Tribe's water rights in the state proceeding, the Tribe is threatened with real and immediate injury in fact because the ". . . United States [is] in the position of making claims against itself; an obvious conflict of interest." [R., Vol. I, p. 36.] We conclude that the threatened injury, as alleged and argued, is not abstract but is real rather than conjectural or hypothetical. *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

Further, we believe that the jurisdictional dispute is ripe for repetitiveness in the context of water rights adjudications in the states of this Circuit alone. Accordingly, it cannot be said that the jurisdictional claim raised is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974). *See also: Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). In *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946) the Court stated that ". . . where federally protected rights have been invaded . . . courts will be alert to adjust their remedies so as to grant the necessary relief."

Holding, as we do, that this Court is vested with appellate jurisdiction we turn now to a discussion and disposition of the basic substantive issues raised.

## II.

Tribe and the United States contend that the District Court erred in dismissing Tribe's complaint and action for want of subject matter jurisdiction because, (a) the Federal District Court for the District of New Mexico has exclusive jurisdiction to adjudicate the water rights of the Tribe inasmuch as the Disclaimer [of jurisdiction by the State] in both the New Mexico Enabling Act and the New Mexico Constitution precludes state court jurisdiction, and (b) the McCarran Amendment does not grant the State of New Mexico subject-matter jurisdiction and it does not repeal the Disclaimer provision.

Preliminary to our discussion and disposition of the aforesaid contentions, we deem it necessary to analyze some of the fundamental law relating to the unique relationship between the United States government and the Indian tribes.

Since the year 1871, Indian tribes have been subject to the power and authority of

the laws of the United States by means of the exercise of its legislative power over them. Prior thereto the various tribes were recognized by the United States as possessing the attributes of separate nations to the extent that treaties were entered into with them. Thus, since 1871 the Congress has regulated Indian affairs and the United States government serves as guardian of the Indian tribes, nations, or bands. *Cherokee Nation v. Hitchcock*, 187 U.S. 294, 23 S.Ct. 115, 47 L.Ed. 183 (1902). It has been said that, in a general way, the relationship now between the United States government and the Indian tribes is that of superior and inferior, in that the government has assumed, in large measure, the care and control of Indians and Indian Tribes. *Montoya v. United States*, 180 U.S. 261, 21 S.Ct. 358, 45 L.Ed. 521 (1901). The paradox, so to speak, is that even though Indian tribes have been held to have a [sovereign] status higher than the states they are nonetheless limited in sovereign power to the extent required of them by the superior sovereign, the United States. *Native American Church v. Navajo Tribal Council*, 272 F.2d 131 (10th Cir. 1959).

■ Congress possesses paramount power over the property of the Indians by reason of its exercise of guardianship over their interests. Thus, plenary authority over the tribal relations of Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one not subject to the control of the judicial branch of government. *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). The propriety or justification of action by the Federal Government, legislatively mandated, relative to Indian lands and properties is a political rather than a judicial question and that power is plenary. *Oneida Indian Nation v. County of Oneida, supra; United States v. Santa Fe Pacific Railroad Co.*, 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941).

■ It is within the power of the Congress to provide that the laws of a state shall extend over and apply to Indian country and activities thereon, where they clearly do not interfere with federal policies concerning the lands. *Warren Trading Post Co. v. Arizona Tax Commission*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); *Organized Village of Kake v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962). The reach of the protective guardian arm of the United States Government is such that in light of the vulnerability of the Indian tribes and because of the special duties assumed by the United States in their protection, special benefits and preferences accorded Indians are not violative of the Equal Protection principle. *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). *Mancari, supra*, and *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), stand for the proposition that statutes enacted for the benefit of the dependent Indian tribes are to be liberally construed and doubtful expressions resolved in favor of the Indians.

In *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973) the Court observed that modern cases tend to ". . . avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power" in order to ascertain whether state action, absent a specific Act of Congress, infringes upon the rights of the Indians to make their own laws and to be governed by them.

■ We turn now specifically to the important jurisdictional issue involving the general water rights adjudication. Significant, we believe, is that the general water rights of the San Juan River and its tributaries in the State of New Mexico sought to be adjudicated include those which are federally owned and established. Federal law governs in determining the extent and status of such rights. *See: United States v. New Mexico*, 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978), where the Court said:

Recognition of Congress' power to reserve water for land which is itself set apart from the public domain, [appurtenant lands withdrawn from the public domain for specific federal purpose as

identified in *Winters v. United States,* 207 U.S. 564 [, 28 S.Ct. 207, 52 L.Ed. 340] (1908); *Arizona v. California,* 373 U.S. 546 [, 83 S.Ct. 1468, 10 L.Ed.2d 542] (1963); *Cappaert v. United States,* 426 U.S. 128, 96 S.Ct. 2062 [, 48 L.Ed.2d 523] (1976)] however, does not answer the question of the amount of water which has been reserved or the purposes for which the water may be used. *Substantial portions of the public domain have been withdrawn and reserved by the United States for use as Indian reservations, forest reserves, national parks, and national monuments.* (Emphasis supplied.)

[98 S.Ct. at [438 U.S. at p. 699, p. 3013.]

This Court has recognized that the federally reserved water rights are subject to the management and control of the United States but that any ". . . collision between private rights and federal rights does not affect the validity of the proceedings or the right of the State to maintain the suit [for water adjudication]. . . . *see also Colorado River Water Conservancy District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 . . . (1976)." *State of New Mexico v. Aamodt,* 537 F.2d 1102, 1108 (10th Cir. 1976), *cert. denied,* 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977). We there further observed:

> . . . The obligation of the United States to fulfill its fiduciary duties to the Pueblos does not diminish the rights of the Pueblos to sue on their own behalf. See *Poafpybitty v. Skelly Oil Co.,* 390 U.S. 365, 370–371, 88 S.Ct. 982, 19 L.Ed.2d 1238 and cases there cited. The instant case is not like *Pueblo of Picuris v. Abeyta,* 10th Cir., 50 F.2d 12 where the private counsel for a pueblo and counsel for the United States took contrary positions on the appeal of a case and the court held that the Attorney General of the United States, not the private counsel, controlled the course of the litigation. *Ibid* at 14.

537 F.2d at p. 1107.

■ The above recitals, we believe, provide authoritative credence to the contention that the United States is the proper party defendant in *any* general water rights adjudication proceeding, whether brought in federal court or state court, relating to federally created water rights, including those reserved for use by Indian tribes. This does not mean that Indian tribes using the federally reserved waters are not granted the right of intervention in any such adjudication, to be represented by private counsel independent of any possible conflict of interest. *See: State of New Mexico v. Aamodt, supra,* at p. 1107. We noted there that the Commissioner of Indian Affairs properly and fairly exercised his discretion pursuant to 25 U.S.C. § 2 in authorizing that "private counsel independent of any possible conflict of interest should be furnished to represent the Indian interests." We further stated that the intervention on behalf of the Pueblos was one of right under Rule 24(a), F.R.Civ.P., 28 U.S.C.

A recent pronouncement by the United States Supreme Court in the area of federal-state court jurisdiction for general adjudication of water rights occurred in the case of *United States v. State of New Mexico, supra,* (July 3, 1978). That litigation was generated when the State of New Mexico filed a complaint-in-intervention in what was initially a private action in a New Mexico State District Court seeking the general adjudication of water rights for the Rio Mimbres and its tributaries. The United States was joined as a party defendant pursuant to the McCarran Amendment, 43 U.S.C. § 666(a). In footnote 1, the Supreme Court recognized the state court's jurisdictional authority as applicable to the adjudication of all rights to the use of water of a river system or other source including ". . . *the reserved rights of the United States. See: United States v. District Court for Eagle County,* 401 U.S. 520 [, 91 S.Ct. 998, 28 L.Ed.2d 278] (1971); *United States v. District Court for Water Div. No. 5,* 401 U.S. 527 [, 91 S.Ct. 1003, 28 L.Ed.2d 284] (1971)." (Emphasis supplied.)

■ In *United States v. State of New Mexico, supra,* the State District Court found that the United States, in setting the

Gila National Forest aside from other public lands, reserved the use of such water ". . . as may be necessary for the purposes for which [the land was] withdrawn" but that such purpose[s] did not include recreation, aesthetics, wildlife preservation or cattle grazing. The United States was unsuccessful in its appeal to the Supreme Court of New Mexico. The United States Supreme Court granted certiorari ". . . to consider whether the Supreme Court of New Mexico had applied the correct principles of *federal law* in determining petitioner's [the United States'] reserved rights in the Mimbres." (Emphasis supplied.) We conclude that a careful reading of that opinion can only lead one to conclude that the Supreme Court recognized the jurisdiction of the state courts by virtue of the McCarran Amendment to undertake general water rights adjudication of a river system or other source applicable to *all* federally reserved water rights, including those waters reserved for the use of Indian tribes. In so concluding, we observe that the only prior impediment to the joinder of the United States as a party defendant in a state court general water right adjudication proceeding was its sovereign immunity, waived by the consent granted under the McCarran Amendment. Sovereign immunity was the *sole* and only legal impediment, our research indicates, to joinder of the United States as a party defendant in state court proceedings relating to federally reserved water rights, including those waters reserved for use by Indian tribes.

In the latter sense, i. e., the reservation of water by the United States for use by the Indian tribes, we are confronted, for the first time, with the contention that because of New Mexico's Disclaimer, a special exception, in effect, must be "carved out" from the McCarran Amendment consent. We now address that argument.

### III.

Section 2 of New Mexico's Enabling Act, 36 Stat. 557, 558–559 (June 20, 1910), provides in applicable part:

That the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title to the unappropriated and ungranted public lands lying within the boundaries thereof, and to all lands lying without said boundaries owned or held by any Indian or Indian tribes the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that until the title of such Indian or indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States; . . .

This section of the Act further states that the covenant is "irrevocable without the consent of the United States and the people of said State."

Article XXI of the Constitution of New Mexico provides in pertinent part:

### PREAMBLE

In compliance with the requirements of the Act of Congress, entitled, "An act to enable the people of New Mexico to form a Constitution and state government and be admitted into the Union on an equal footing with the original states; and to enable the people of Arizona to form a Constitution and state government and be admitted into the union on an equal footing with the original states," approved June twentieth, nineteen hundred and ten, it is hereby provided: . . . .
Sec. 2. The people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated and ungranted public lands lying within the boundaries thereof, and to all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through the United States, or any prior sovereignty; and that until the title of such Indian or Indian tribes shall have been extinguished the same [lands] shall be and remain subject to the disposition and under the absolute jurisdiction and control

of the Congress of the United States;
. . ..

By 1910, the date of the enactment of New Mexico's Enabling Act, both the Congress and the United States Supreme Court had established a procedure whereby Indian reservations might be created as exclusive federal enclaves within states and territories, similar to military reservations created under the Arsenals and Dockyards Clause (U.S.Const. Art. I, § 8, Cl. 17). This procedure was followed exclusively only with respect to the Kansas Indians. A different procedure was followed with respect to the grant of New Mexico's statehood. In any event, today there is no exclusive federal jurisdictional Indian Reservation in the United States.

Public Law 280, was originally enacted by Congress as the Act of August 15, 1953, ch. 505, §§ 1–7, 67 Stat. 588, P.L. 83–280, and is partially codified at 18 U.S.C. § 1162 and 28 U.S.C. § 1360, as amended. The Act authorized the states to assume civil and criminal jurisdiction over Indians residing on Indian reservations. Sections 6 and 7 provide:

Sec. 6. Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: *Provided*, That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be.

Sec. 7. The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof.

This Act became law some thirteen months *after* the McCarran Amendment was enacted. The McCarran Amendment, we reiterate, grants the consent of the United States to be joined as a party defendant in any state court proceeding for the adjudication of rights to the use of water of a river system or other source. The pertinent portion of the McCarran Amendment here involved is 43 U.S.C. § 666(a), to-wit:

(a) Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a water system or other source . . .. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances . . ..

The "Disclaimer" terminology of the various Enabling Acts, constitutions and statutes varies. The Colorado "disclaimer" contained in its Enabling Act exempts "Indians not taxed" from the proviso that the Constitution of the state "shall be republican in form, and make no distinction in civil or political rights on account of race or color." Enabling Act, § 4, Vol. I, C.R.S.1973. Congress did not distinguish between "Disclaimers" based on the language of each in the 1953 Act. Our limited research indicates that in 1953 there was "disclaimer" language of various kinds in the state constitutions of Arizona, Montana, New Mexico, North Dakota, Oklahoma, South Dakota, Utah, Washington and Wyoming. Some eleven states, including Colorado and Kansas, enacted "disclaimer" statutes. None of the western states assumed full jurisdiction pursuant to the 1953 Act. In fact, six states assumed only partial jurisdiction. Colorado, Kansas, New Mexico, Oklahoma

and Wyoming did not assume any effective jurisdiction. Such failure, argues the Tribe, is fatal, citing to *Kennerly v. District Court,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971) for the rule that the procedures specified in Pub.L. 280 are exclusive (i. e., amendment of state constitutions or statutes) to the assumption [by the states] of civil and criminal jurisdiction. Furthermore, Tribe contends that the McCarran Amendment neither repeals the disclaimer provisions of the various states nor grants the consent of the United States otherwise. Thus, the Tribe argues that because the McCarran Amendment does not mention the disclaimer provisions or Indians, it did not amend, modify or repeal New Mexico's disclaimer. Reliance is placed on language contained in the case of *Your Food Stores, Inc. (NSL) v. Village of Espanola,* 68 N.M. 327, 361 P.2d 950 (N.M.1961), *cert. denied,* 368 U.S. 915, 82 S.Ct. 194, 7 L.Ed.2d 131 (1961), for the point that the State can only exercise jurisdiction over Indians if the federal government has specifically granted it. This point, while correct, in our view is inapposite.

We hold that the United States is the proper party defendant—and was clearly so intended to be by the Congress in the enactment of the McCarran Amendment—to represent, as guardian, the federally reserved water rights of the Indian tribes in any state court general water rights adjudication proceeding to which the United States is properly named and served as a party defendant. The legislative history [2] of the

McCarran Amendment giving consent to join the United States manifests the Congressional intent to accomplish in one forum the general settlement of water rights of many users of a river system or other source. It is, of course, only by reason of the McCarran Amendment, as interpreted by the United States Supreme Court, that the United States may be so named as a party defendant in the state court even though the suit arises under a state statute and the federally reserved rights involve an interpretation and application of federal law. The rationale for the principle was succinctly stated by the Supreme Court in *Will, U. S. District Judge v. Calvert Fire Insurance Co.,* 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978):

It is well established that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *McClellan v. Carland,* 217 U.S. 268, 282 [, 30 S.Ct. 501, 505, 54 L.Ed. 762] (1910). It is equally well settled that a district court is "under no compulsion to exercise that jurisdiction," *Brillhart v. Excess Ins. Co.,* 316 U.S. 491, 494 [, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620] (1942), where the controversy may be settled more expeditiously in the state court. Although most of our decisions discussing the propriety of stays or dismissals of duplicative actions have concerned conflicts of jurisdiction between two federal district courts, *e.g., Kerotest Mfg. Co., v.*

2. "In the administration of and the adjudication of water rights under state laws the state courts are vested with the jurisdiction necessary for the proper and efficient disposition thereof, and by reason of the interlocking of adjudicated rights on any stream system, any order of action affecting one right affects all such rights. Accordingly, all water users on a stream, in practically every case, are interested and necessary parties to any court proceedings. It is apparent that if any water user claiming to hold such right by reason of the ownership thereof by the United States or any of its departments is permitted to claim immunity from suit in, or orders of, a state court, such claims could materially interfere with the lawful and equitable use of water for beneficial use by the other water users who are amenable to and

bound by the decrees and orders of the state courts."

S.Rep. No. 755 at 4–5, 82d Cong., 1st Sess. (1951).

This identical language was relied upon by the Supreme Court in *Colorado River Water Cons. Dist. v. United States, supra,* for the statement: "Not only the [McCarran] Amendment's language, but also its underlying policy, dictates a construction including Indian [water] rights in its provisions. . . . Thus, bearing in mind the ubiquitous nature of Indian water rights in the Southwest, it is clear that a construction of the Amendment excluding those rights from its coverage would enervate the Amendment's objective." (Footnote omitted.) 424 U.S. at pp. 810, 811, 96 S.Ct. at pp. 1242, 1243.

*C–O–Two Fire Equipment Co.,* 342 U.S. 180 [, 72 S.Ct. 219, 96 L.Ed. 200] (1952); *Landis v. North American Co.,* 299 U.S. 248 [, 57 S.Ct. 163, 81 L.Ed. 153] (1936), we have recognized the relevance of those cases in the analogous circumstances presented here. See *Colorado River,* [supra,] 424 U.S., at 817–819 [, 96 S.Ct. at 1246–1247]. In both situations, the decision is largely committed to the "carefully considered judgment," *Id.,* at 818, 96 S.Ct. at 1246 of the District Court.

This power has not always been so clear. In *McClellan,* on facts similar to those presented here, this Court indicated that the writ might properly issue where the District Court had stayed its proceedings in deference to concurrent state proceedings. Such an automatic exercise of authority may well have been appropriate in a day when Congress had authorized fewer claims for relief in the federal courts, so that duplicative litigation and the concomitant tension between state and federal courts could rarely result. However, as the overlap between state claims and federal claims increased, this Court soon recognized that situations would often arise when it would be appropriate to defer to the state courts.

"Ordinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties. Gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided." *Brillhart, supra* [316 U.S.], at 495 [, 62 S.Ct., at 1175].

The decision in such circumstances is largely committed to the discretion of the District Court. 316 U.S., at 494 [, 62 S.Ct. 1173]. Furthermore, *Colorado River, supra* [424 U.S.], at 820, 96 S.Ct., at 1247, established that such deference may be equally appropriate even when matters of substantive federal law are involved in the case. (Footnote omitted.) 437 U.S., at 662–664, 98 S.Ct., at 2557, 2558.

In *Cappaert v. United States,* 426 U.S. 128, 145, 96 S.Ct. 2062, 2073, 48 L.Ed.2d 523 (1976) the Supreme Court stated: "Federal water rights are not dependent upon state law or state procedures and they need not be adjudicated only in state courts; federal courts have jurisdiction under 28 U.S.C. § 1345 to adjudicate the water rights claims of the United States. *Colorado River Water Cons. Dist. v. United States,* 424 U.S., at 807, 809 [, 96 S.Ct. at 1240–1242, 47 L.Ed.2d, at 491, 493.] The McCarran Amendment, 66 Stat. 560, 43 U.S.C. § 666, did not repeal § 1345 jurisdiction as applied to water rights."

In our view, there exists no conflict between the state court assumption of jurisdiction governing general water rights adjudication, including that of federally reserved water rights, involving the joinder of the United States as proper party defendant to represent the interests of the federally reserved water rights, and the Disclaimer provisions. The basic, fundamental reason is that the United States is the proper party to protect *all* federally reserved water rights, including those set aside for use by the Indian tribes.

Moreover, in view of the McCarran Amendment and the strong policy behind it outlined in the *Colorado River* opinion of the Supreme Court, we feel that subject matter jurisdiction should be recognized as allowable in the state courts of the general water rights adjudication proceeding, there being implicit modification of the Enabling Act to that extent, as necessary. And the state statute, § 74–4–6, N.M.S.A. (1953) affords an adequate state court jurisdictional basis, without any exception as to Indian reservations, for disposition of this water adjudication proceeding. *See: State ex rel. Reynolds v. Lewis,* 88 N.M. 636, 545 P.2d 1014 (1976).

It follows that the waiver of sovereign immunity accomplished pursuant to the McCarran Amendment supports the state's claim here. *Cappaert v. United States, supra; Colorado River Water Conservation*

*District v. United States, supra.* It is significant to note that in *United States v. District Court in and for Eagle County, Colorado, supra,* the United States moved to dismiss an action brought for general water rights adjudication in a Colorado state court based upon the contention that the McCarran Amendment did not constitute the consent of the United States to submit to a state court adjudication of the reserved water rights of the United States inasmuch as the federally reserved water rights may potentially be at war with water rights based on the state's appropriation system. The Supreme Court rejected the argument advanced by the United States that the McCarran Amendment granted consent to join the United States as a party defendant in a state court adjudication proceeding *only* if the water rights of the United States were acquired pursuant to state law. The Court emphatically held that the state court was dealing with an all-inclusive statute concerning "the adjudication of rights to the use of water of a river system" which includes appropriative rights which the court found to specifically include those waters reserved by the United States for the use and benefit of Indian reservations. The court cited *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963).

We believe that the following language in *Colorado River Water Conservation District v. United States, supra,* is clear on the effect of the McCarran Amendment to reserved rights held by the United States on behalf of Indians:

. . . This is a question not previously squarely addressed by this Court, and given the claims for Indian water rights in this case, dismissal clearly would have been inappropriate if the state court had no jurisdiction to decide those claims. We conclude that the state court had jurisdiction over Indian water rights under the amendment.

*United States v. District Court for Eagle County,* 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971) and *United States v. District Court for Water Div. 5,* 401 U.S. 527, 91 S.Ct. 1003, 28 L.Ed.2d 284 (1971)

held that the provisions of the McCarran Amendment whereby "consent is ˙. . given to join the United States as a defendant in any suit (1) for the adjudication . . . or (2) for the administration of [water] rights, where it appears that the United States is the owner . . by appropriation under state law, by purchase, by exchange, or otherwise . .," subject federal reserved rights to general adjudication in state court proceedings for the determination of water rights. . . . Though *Eagle County* and *Water Div. 5* did not involve reserved rights on Indian reservations, viewing the Government's trusteeship of Indian rights as ownership, the logic of those cases clearly extends to such rights. Indeed, *Eagle County* spoke of non-Indian rights and Indian rights without any suggestion that there was a distinction between them for purposes of the Amendment. 401 U.S., at 523 [, 91 S.Ct. 998].

Not only the Amendment's language, but also its underlying policy, dictates a construction including Indian rights in its provisions.

424 U.S., at pp. 809, 810, 96 S.Ct., at p. 1242.

Footnote 20 in *Colorado River Water Conservation District, supra,* is, in our view, of special application here:

To be sure, 25 U.S.C. § 1322(b) and 28 U.S.C. § 1360(b) provide that nothing in those sections "shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right of possession of [any real or personal property, including water rights, belonging to any Indian or any Indian Tribe . . . that is held in trust by the United States]." This provision in both sections, however, only qualifies the import of the general consent to state jurisdiction given by those sections. *It does not purport to limit the special consent to jurisdiction given by the McCarran Amendment.* A contrary conclusion is foreclosed by the principle of construction that "[w]here there is no clear intention otherwise, a specific statute will not

be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari,* 417 U.S. 535, 550–551 [, 94 S.Ct. 2474, 41 L.Ed.2d 290] (1974). (Emphasis supplied.)

424 U.S., at pp. 812, 813, 96 S.Ct., at p. 1244.

■ When the Congress was dealing with the McCarran Amendment, it was deemed to be fully cognizant of the provisions of 25 U.S.C. § 1322(b) and 28 U.S.C. § 1360(b). There is authority indicating that the Congress specifically rejected an exemption of reserved Indian water rights from the McCarran Amendment. The Court, in *Colorado River Water Conservation District, supra,* specially observed that when the Senate Judiciary Committee rejected a Department of Interior recommendation that Indian water rights be exempted from the Act that this amounted to a rejection of the proposition that special treatment should be accorded federally reserved water rights for Indian users. 424 U.S., at p. 812, 96 S.Ct. 1236. Furthermore, where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one. *Colorado River Water Conservation District v. United States, supra; Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 436 (1973); *Glover Construction Co. v. Andrus,* 591 F.2d 554 (10th Cir. 1979); Sutherland, Statutory Construction, 4th Ed., Vol. 2A, § 51.05.

### IV.

State contends that a further basis supporting the District Court's dismissal for want of jurisdiction is the principle that the State's disclaimer of all right and title to Indian lands applies only to a proprietary interest in such lands. This argument was adopted by the Supreme Court of New Mexico in the case of *State ex rel. Reynolds v. Lewis,* 88 N.M. 636, 545 P.2d 1014 (1976), in reliance on *Kake Village v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962). The contention is particularly persuasive in light of the non-proprietary intent in subjecting the United States to a state action involving a general water right adjudication as provided under the McCarran Amendment.

*Kake v. Egan, supra,* involved an appeal by the Secretary of Interior from a decision by the Alaska Supreme Court upholding the denial of the Secretary's petition to enjoin the State of Alaska from forbidding the Thlinget Indians residing in incorporated communities from the use of salmon traps. The United States Supreme Court noted that the Alaska Statehood Act contained three provisions relating to Indian property: (a) the state must disclaim right and title to such property, (b) the United States retains "absolute jurisdiction and control" over right and title of Indian property, and (c) the state may not tax Indian property. Thus, although the terminology varies somewhat from the New Mexico Disclaimer we conclude that, in legal effect, there is no distinguishable difference. The Court interpreted the Alaska provisos as follows:

The provision for "absolute jurisdiction and control" [by the United States] received little attention in Congress. . . Mr. Barney [on behalf of the Justice Department], denied that the provision would deprive the State of "political jurisdiction" over disclaimed properties.

. . .

\* \* \* \* \* \*

. . . Provisions retaining federal "jurisdiction" and "absolute jurisdiction" were considered interchangeable by at least one committee, which reported the disclaimer in an Alaska bill as "almost identical" with those of the preceding 13 admission Acts. S.Rep. No. 315, 82d Cong., 1st Sess. 15 (1951).

\* \* \* \* \* \*

. . . The Senate amendment was designed simply to make clear what an examination of past statutes and decisions makes clear also: that the words "absolute jurisdiction and control" are not intended to oust the State completely from regulation of Indian "property (including fishing rights)."

369 U.S. at pp. 69–71, 82 S.Ct. at p. 568.

The Court, after reviewing a number of its prior decisions, also observed:

These decisions indicate that even on reservations state laws may be applied to Indians unless such application would interfere with reservation self-government or impair a right granted or reserved by federal law.

369 U.S. at p. 75, 82 S.Ct. at p. 571.

In *McClanahan v. Arizona State Tax Comm'n, supra,* the Supreme Court held that Arizona had no jurisdiction to impose a tax on the income of Navajo Indians residing on the Navajo Reservation and whose income is wholly derived from reservation sources. This holding was predicated on the proposition that by imposing the tax, Arizona interfered with matters which the relevant treaty and statutes leave to the exclusive province of the Federal Government and the Indians themselves. The Arizona Enabling Act, like that in the case at bar, whose language is duplicated in the Arizona Constitution, disclaims state title over Indian lands and provides that such lands remain "under the absolute jurisdiction and control of the Congress of the United States." The Arizona Supreme Court, relying upon *Organized Village of Kake v. Egan, supra,* held that the Enabling Act permitted concurrent state jurisdiction so long as tribal self-government remained intact and that an individual state income tax did not interfere with tribal self-government.

In *McClanahan, supra,* the Supreme Court, in reversing, placed great emphasis upon the terms of the Navajo Treaty of July 15, 1868, saying:

. . . [I]t cannot be doubted that the reservation of certain lands for the exclusive use and occupancy of the Navajos and the exclusion of non-Navajos from the prescribed area was meant to establish the lands as within the exclusive sovereignty of the Navajos under general federal supervision. It is thus unsurprising that this Court has interpreted the

Navajo treaty to preclude extension of state law—including state tax law—to Indians on the Navajo Reservation. See *Warren Trading Post Co. v. Arizona Tax Comm'n,* 380 U.S. [685], 687, 690 [, 85 S.Ct. 1242, 14 L.Ed.2d 165]; *Williams v. Lee, supra,* 217 at 221–222 [, 79 S.Ct. 269, 3 L.Ed.2d 251].

\* \* \* \* \* \*

Moreover, since the signing of the Navajo treaty, Congress has consistently acted upon the assumption that the States lacked jurisdiction over Navajos living on the reservation.

411 U.S. at pp. 174, 175, 93 S.Ct. at pp. 1263, 1264.

Thus, while the Court in *McClanahan, supra,* did observe that the Arizona Enabling Act was silent on the specific question of tax immunity, still the Congressional intent to maintain the tax-exempt status of reservation Indians is clear in light of the Buck Act.[3] Further, the Supreme Court distinguished *Organized Village of Kake v. Egan, supra,* on the basis that *Kake* did not purport to provide guidelines for the exercise of state authority (for a state to assume civil and criminal jurisdiction over Reservation Indians) in areas set aside by treaty for the exclusive use and control of Indians. Even though the Court did not suggest or imply that Arizona would "necessarily be empowered" to impose the state tax had it followed the procedures outlined in 25 U.S.C. § 1322, *et seq.,* the Court obviously placed weight on the fact that Arizona had not acted.

*McClanahan, supra,* held that state taxing jurisdiction was pre-empted by applicable treaties or statutes and this was reaffirmed in *Moe v. Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). The Court there upheld a federal district court's order barring Montana from imposing cigarette sales taxes with respect to on-reservation sales by tribal members to Indians residing thereon. *Moe, supra,* held that the state tax statute ran afoul of Con-

**3.** The Buck Act, 4 U.S.C. § 105, *et seq.,* provides comprehensive guidance relative to state sales or use taxation applicable to those living within federal areas. The Act specifically exempts reservation Indians from its coverage. 4 U.S.C. § 109.

gressional enactments dealing with the affairs of reservation Indians and in so doing quoted from *United States v. McGowan,* 302 U.S. 535, 539, 58 S.Ct. 286, 82 L.Ed. 410 (1938): "Enactments of the Federal government passed to protect and guard its Indian wards only affect the operation, within the colony, of such state laws as conflict with the federal enactments." 425 U.S. at p. 483, 96 S.Ct. at p. 1646.

 In *Draper v. United States,* 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419 (1896) the Court construed the Montana Enabling Act which contained a disclaimer identical to that of New Mexico and Arizona. The Court concluded that nothing therein could be construed to constitute exclusive federal jurisdiction. The significance of this opinion is, we believe, spelled out by this language in *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973):

. . . The upshot [of more individualized treatment of certain treaties and specific federal statutes, including statehood enabling legislation as they, taken together, affect the respective rights of states, Indians and the Federal Government] has been the repeated statements of this Court to the effect that, even on reservations, state laws may be applied unless such application would interfere with reservation self-government or impair a right granted or reserved by federal law. *Organized Village of Kake,* supra [, 369 U.S.] at 75 [, 82 S.Ct. 562]; *Williams v. Lee,* 358 U.S. 217 [, 79 S.Ct. 269, 3 L.Ed.2d 251] (1959); *New York, ex rel. Ray v. Martin,* 326 U.S. 496, 499 [, 66 S.Ct. 307, 90 L.Ed. 261] (1946); *Draper v. United States,* 164 U.S. 240 [, 17 S.Ct. 107, 41 L.Ed. 419] (1896).

411 U.S. at p. 148, 93 S.Ct. at p. 1270.

We thus conclude, as did the New Mexico Supreme Court in *Lewis, supra,* and *Sangre De Cristo Development, Inc. v. City of Santa Fe,* 84 N.M. 343, 503 P.2d 323 (N.M.1972), cert. denied, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 400 (1973), that the New Mexico constitutional disclaimer of right and title to Indian lands prohibits the state from asserting a proprietary interest in Indian lands, but does not constitute a disclaimer of state control which does not "interfere[s] with reservation self-government or impair a right granted or reserved by federal law." In *Montoya v. Bolack,* 70 N.M. 196, 372 P.2d 387 (1962), the Court said:

Congress itself has recognized that the Indians must at some time become an integral part of the country and gradually be assimilated into society. . . . The states are authorized to enforce sanitation and quarantine laws on a reservation, to make inspections for health and educational purposes, and to enforce compulsory school attendance . . . [citing to express congressional enactment]. 372 P.2d, at 393.

We have recently stated that "In summary, the cases stress that regulatory powers in Indian country or on Indian lands belong to the Congress except for inherent jurisdiction of the tribes. Congress may delegate this authority to the state, but when it does so it must be in specific terms." *United States v. State of New Mexico,* 590 F.2d 323, 328 (10th Cir. 1978). Such delegation was precisely the effect of the McCarran Amendment.

### Conclusion—Disposition

We thus hold that the District Court did not err in dismissing that portion of the Tribe's complaint seeking a general water rights adjudication of the San Juan River stream system. We agree with the District Court's dismissal of this portion of the complaint in light of the fact that an identical action had been previously filed in the state court and was pending when the Tribe's complaint was filed in the federal District Court.

 We conclude, however, that the District Court erred in dismissing that portion of the Tribe's complaint seeking an injunction against the Secretary of the Interior for alleged wrongful and excessive diversions of water from the San Juan-Chama Project in violation of the rights of the Tribe. We also conclude that the San Juan-

**1136**

Chama diversion claim and the general water rights adjudication proceeding do not arise from a "common nucleus of operative fact." *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Durso v. Rowe,* 579 F.2d 1365 (7th Cir. 1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979); *Hales v. Winn-Dixie Stores, Inc.,* 500 F.2d 836 (4th Cir. 1974); *Lanning v. Serwold,* 474 F.2d 716 (9th Cir. 1973); 3A Moore's Federal Practice, § 18.07[1.–3]. Thus no pendent jurisdiction could be exercised to retain the general water rights adjudication proceeding in the federal District Court. At least some of the Tribe's claims against the Secretary of the Interior arise under federal law. Certainly no one contends that the claims are insubstantial. Accordingly, we view these claims as coming within the plain terms of 28 U.S.C. § 1362 as a civil action brought by an Indian tribe arising under the Constitution, laws or treaties of the United States. *Colorado River Water Conservation District v. United States, supra,* refers to the "unflagging obligation of the federal courts to exercise the jurisdiction given them." 424 U.S. at 817, 96 S.Ct. at 1246. *California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978) does not dictate otherwise. The court there held that state substantive water law will generally apply in relation to a federal water appropriation permit obtained from a state absent specific Congressional directives inconsistent with state law. That opinion does not, however, reach the state versus federal court jurisdictional issue presented in the case at bar.

We affirm the District Court's dismissal of the Tribe's complaint seeking a general water rights adjudication of the San Juan River stream system. We reverse the District Court's dismissal of the Tribe's complaint seeking injunctive relief against the Secretary of the Interior relative to the San Juan-Chama Project diversion claims, and remand to the District Court for adjudication of the Tribe's claims relative thereto.